### TORREY v. KELLY.

(Circuit Court of Appeals, Ninth Circuit.  February 9, 1903.)

#### No. 827.

1. SHIPPING—CARRIAGE OF PASSENGER—POINT OF DESTINATION—CONSTRUCTION OF CONTRACT.

Evidence in a libel by a passenger against a vessel for an alleged breach of contract in not landing him at the mouth of a certain river examined, and *held* to show the making of a contract to land libelant merely as near to the mouth as could be done with safety.

2. SAME—DISCRETION OF MASTER.

Where the master of a vessel agrees to transport a passenger to a point as near the mouth of a certain river as will admit of a safe landing, it is for the master to determine, in good faith, where the landing shall be made.

8. SAME—ATTEMPTED LANDING—EXERCISE OF GOOD FAITH.

Evidence in a libel by a passenger against a vessel for breach of contract in not landing him as near to the mouth of a river as could be done with safety examined, and *held* to show that the contract was complied with by the master.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

D. C. Conover and R. F. Jones, for appellant.

Greene & Griffith and Austin E. Griffiths, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.  The appellee, Kelly, libeled the schooner Thomas Bayard, her tackle, apparel, and furniture, for an alleged breach of a contract alleged to have been made between the libelant and the master of the schooner, one Torrey, by which the master agreed to carry the libelant and his mining outfit on board the schooner to, and land them at the mouth of, a river designated in the libel as Kowack river, in Norton Bay, Alaska, and for certain alleged damage to the libelant's provisions, growing out of their being landed in a leaky boat at another place, and for certain alleged loss claimed to have been suffered by the libelant by reason of his being compelled to use for the building of a boat a certain portion of his outfit, consisting

of lumber, and intended by him for sluice boxes. For a second cause of action the libelant alleged that he advanced to the master of the schooner $50 in cash, which was used by the latter, and was necessary to be used by him, in procuring and paying for provisions for the master and crew of the schooner on the voyage then about to be undertaken. The answer of the claimant denied, among other things, the making of the contract as alleged, but set up that he contracted with one Carroll to transport the libelant, not to the mouth of Kowack river, but to Norton Bay, and that that contract he duly performed.

The evidence in the case, which we have examined with care, shows that Carroll and Kelly had entered into an arrangement by which Carroll should furnish Kelly with the necessary provisions and pay his expenses on a mining prospecting trip to Alaska, and that Kelly should contribute his time, labor, and skill to the undertaking, for the joint and equal benefit of both parties thereto. Carroll's clerk and representative, Abernethy, and Kelly, negotiated with Torrey for the transportation of Kelly to his destination. The evidence shows that Torrey knew that Kelly wished to go to the mouth of and up the river in question, the true name of which seems to be Qwik or Quik river, and that Torrey, Kelly, and Abernethy, on behalf of Carroll, discussed the question as to how close to the mouth of the river the master of the schooner could take Kelly; the latter stating that there was sufficient channel to enable the vessel to approach near enough the mouth of the river to land passengers, and the master stating that he did not know the channel there, but that he would take the schooner as far up the bay and as close to the mouth of the river as could be done with safety to the vessel. The latter, we think, was the contract that the master made to transport Kelly and his outfit, and for which Abernethy on behalf of Kelly paid him. It is conceded that at the time of the making of the contract of carriage, as well as at the time when the voyage was made, there was no chart of Norton Bay, into which the river in question entered. Therefore the probabilities all corroborate Abernethy's testimony to the effect that the agreement was that the master should take and land Kelly as near the mouth of the river as could be done with safety.

The evidence shows that the master carried Kelly and his outfit, together with a few other miners and their outfits, to Alaska, and up Norton Bay to within a few miles of the mouth of the river in question, where he anchored about eleven hours, and finding the water breaking so badly around his boat, and deeming it unsafe to remain there, sought another point in the bay from which to land the passengers with their belongings, variously estimated by the witnesses at from 15 to 27 miles from the mouth of the river, and from which point all of the passengers, including Kelly with his outfit, were sent ashore in small boats.

As the master's contract, as we think the evidence shows it to have been, was not to carry the libelant and his outfit to, and land them at the mouth of, the river, but only so near thereto as he could with safety to his vessel, it must, we think, be admitted that, in the absence of any showing of bad faith, it was for the master to determine how near to the mouth of the river he could approach and make a landing. Not

only do we fail to discover anywhere in the testimony any evidence of bad faith on the part of the master, but we think it quite clearly appears therefrom that he endeavored to make the landing at the mouth of the river, and only gave up the attempt after becoming convinced that the safety of the schooner and his passengers and crew required him to do so. The evidence shows that he remained in close proximity to the mouth of the river for about eleven hours, and that when the condition of the water indicated to him that safety required him to seek another landing place he sounded continuously until he found the place from which the landing was effected.

Being of the opinion that the evidence shows that the contract as made was performed, and agreeing with the court below that while there was probably some slight damage to the libelant's provisions in landing them, yet the evidence furnishes no basis for estimating the actual loss, and being of opinion, further, that the alleged advance by the libelant is not sustained by the evidence, the judgment must be reversed, and cause remanded, with directions to the court below to dismiss the libel at the libelant's cost.

It is so ordered.