[No. 16040.   Department One.   January 25, 1921.]

ED DANIELSON *et al., Appellants,* v. LIBBY, McNEILL & LIBBY, *Respondent.*[1]

SEAMEN (1)—WHO ARE SEAMEN. The fishermen and crew of a fishing boat signing shipping articles come within the designation of seamen and their rights as to wages in case of salvage work are governed by those of seamen.

SEAMEN—RIGHT TO CLAIM SALVAGE. Seamen may not claim compensation for salvage upon abandonment of the ship unless the abandonment was by order of the master.

SEAMEN (2)—SHIPPING ARTICLES—COMPENSATION ON SALVAGE. Under shipping articles providing that the seamen would do such work as was necessary to protect the ship if endangered, without extra compensation, and that no salvage should be earned or paid except after shipwreck or abandonment, seamen are not entitled to salvage for services, where the ship went aground and the seamen, after hazardous work in saving the vessel and cargo, were paid their wages and discharged and the vessel was finally floated and taken to port, never having been abandoned.

Appeal from a judgment of the superior court for King county, Jurey, J., entered April 9, 1920, dismissing an action to recover salvage by seamen, upon sustaining a demurrer to the complaint. Affirmed.

[1]Reported in 195 Pac. 37.

*Jay C. Allen* (*E. W. Howell,* of counsel), for appellants.

*Kerr, McCord & Ivey,* for respondent.

MACKINTOSH, J.—The complaint, as aided by a bill of particulars, shows that the respondent is engaged in the fish canning business in Alaska, and in connection therewith operates fishing boats; that, annually before the fishing season opens, it collects at Seattle such men as it requires for fishermen, beachmen, trapmen and seamen, and ships them on the company's vessels to Alaska, where they are used in connection with the canneries there.

The numerous plaintiffs were some of the men so employed by the respondent for the season of 1918, and shipped on board of the respondent's vessel, "W. B. Flint," on April 10, of that year. They each signed a written agreement and shipping articles, which agreement is of considerable length but need be noticed only in the following particulars, so far as this action is concerned. It provides, in section one, that "in cases of emergency such as safety of ships or company's property being in danger, such work shall be done at any and all times without extra compensation." Section 3, provides:

"The time of service shall be from the date of sailing from, until return to Seattle, all on vessels to be designated by the company, except in case of shipwreck or necessitated abandonment of the ship through stress of weather, or lawful discharge, then all wages shall cease at the date of such casualty or discharge, except for such men as are paid for the run; if such disaster occurs before or after the vessel has arrived at its destination in Alaska, these men shall receive the full run money. In addition to run money and all other earnings, salvage work shall be paid for at the rate of One Dollar ($1.00) per hour for all hours

so worked; money so earned to be paid to the individual men doing such work. All men assigned to such abandoned or wrecked vessel to be given free return passage, including maintenance.''

Section 25 provides that,

''In case of any assistance rendered to any vessel or property of the Libby, McNeill & Libby Co., no salvage shall be claimed or paid to parties of the second part therefor except as provided in section 3.''

When the ''Flint'' reached Bristol Bay, it encountered floating ice. It was at that time in close proximity to the shore, and when off Cape Chicagof it ran aground and became fast. Unsuccessful efforts were made to get the vessel into deep water. The tides and wind brought the ice against the side of the vessel and stove numerous holes in her hull. Water was made so rapidly that the pumps could not control it, and for several days, at the request of the master, the appellants were at work endeavoring to protect the vessel. Some were at the pumps and others were working in an endeavor to place patches over the holes; some were carrying cargo ashore and bringing back fresh water to the vessel, making the trip over the ice pack. These acts were done under the direction of the master of the vessel and the superintendent of the respondent's plant, who was aboard. The rudder had been lost, the sides of the vessel torn open and she was fast on the shoals. In this condition the vessel remained for nine days, when one of the respondent's tugs came to her assistance and attempted to tow her to a place of greater safety, but was unsuccessful, tide and wind carrying the vessel farther inshore, where she grounded on some rocks, and the tug left her. All persons were directed to go ashore, the master sending his instruments and belongings with them, but remained aboard with the mate and one of the ap-

pellants to assist him in leaving the vessel in case she broke up too fast, a contingency which he anticipated might occur at any time. The vessel was then one-half or three-quarters of a mile off shore, and the appellants made many trips from shore to vessel when the condition of the ice permitted, taking cargo to a place of safety. This work was attended with great danger and risk of injury, and continued for eight days, during which time the vessel was carried closer inshore, where she grounded with a considerable list, and the appellants cut holes in the lower side so that at low tide the water in the hold was able to escape. Before the tide turned these holes were covered by the appellants. In great danger to themselves, the appellants carried on this work. The vessel was finally saved and taken into port and repaired. The "Flint" completed her voyage and the appellants received the wages provided for in their contracts.

The appellants brought this action, claiming compensation under section 3 of the contract at the rate of one dollar per hour for the time they were engaged therein.

The appellants come within the designation of seamen and their rights are to be measured by those of seamen, and to them is applied the general rule that, under ordinary circumstances, they may not become general salvors of their own vessel, on the theory that by their contract they engaged for the stipulated wages to render such services as were necessary in the ship's behalf. There have been impressed upon this rule, however, certain exceptions which apply unless otherwise provided for in the contract and shipping articles. These exceptions are, some cases state, that seamen are entitled to salvage for extraordinary services beyond their duties under their contract. An examination of those cases, however, shows that these state-

ments are mere *obiter,* and, as stated by the author of the note in *Gilbraith v. Stewart Transp. Co.,* 121 Fed. 540, 64 L. R. A. 193:

"While the exception is thus admitted by *dicta* or *arguendo,* no decisions have been found in reliance upon it, although the probability that such decisions exist is intimated in one or two instances. It may be, however, that these cases refer to decisions allowing compensation in the nature of salvage for especially meritorious services."

The next exception is where the seamen have been discharged and have performed the work of saving the vessel or cargo after such discharge. This situation, of course, does not exist in this case. The third of these exceptions is where the vessel has been abandoned, and the cases hold that the crew of a vessel under articles for wages can become general salvors after the vessel has become wrecked without hope of recovery and the crew discharged from further services by the master of the vessel. The abandonment of the ship has the effect of dissolving the seamen's contract for wages so that for any services they thereafter render in saving the ship and cargo they may claim compensation as salvors, but they only become such salvors when there is such an abandonment of the vessel by order of the master. The difficulty arises in these cases of determining whether the facts constitute an abandonment.

The following cases are a few of the many which have dealt with the question of abandonment: *Hobart v. Drogan,* 10 Pet. (U. S.) 108; *The Dawn,* Fed. Cas. 3,666; *Hall v. Land,* Fed. Cas. 3,939; *Holder Borden,* Fed. Cas. 6,600; *John Perkins,* Fed. Cas. 7,360; *The Minch,* 61 Fed. 511; *The Minch,* 73 Fed. 859; *Torrey v. Kelly,* 121 Fed. 542; *The Comet,* 205 Fed. 991; *The Zapora,* 205 Fed. 1004.

The *Minch* case in 73 Fed. 859, reviews a great number of prior decisions of the Federal courts and the courts of England and after such review says:

"From this review of the authorities, it is apparent that, in every case where compensation in the nature of salvage has been awarded to seamen, the voyage has terminated by the shipwreck of the vessel, which has either gone to the bottom or left her bones on the shore, or she has been abandoned by all, or by all except the salvors, under circumstances which show conclusively that the abandonment was absolute, without hope or expectation of recovery, or the seaman has been by the master unmistakably discharged from the service of the shipowner."

The rule applicable to abandonment finds no better statement than that by Dr. Lushington, in *The Florence,* 16 Jur. 572, 20 Eng. Law & Eq. 607, where that distinguished authority on admiralty law lays down the rule that the elements indispensable to an abandonment in order to make the status of a seaman that of a salvor are that the abandonment must take place at sea and not upon a coast, for if the ship is wrecked upon a coast and the seamen escape to shore the contract continues to the extent, at least, that if they successfully act as salvors and save enough to pay their wages they are entitled to them but not to salvage, and if their exertions are not successful to that extent they then lose their wages; second, the abandonment must be *sine spe revertendi*; for a temporary abandonment does not dissolve the contract; third, the abandonment must be *bona fide* for the purpose of saving life; and, fourth, it must be by order of the master.

The Federal court, in the case of *Gilbraith v. Stewart Transp. Co., supra,* in a short opinion thoroughly discusses and elucidates this question:

"The crew of a vessel, under articles for wages, can become general salvors, only after the vessel has be-

come a shipwreck, without hope of recovery, and the crew discharged from further service. This general doctrine is not disputed. But it is insisted that, under certain circumstances, the crew though under articles for wages may become special salvors. Such relation arises, it is said, when the service rendered is arduous, perilous and meritorious, and under circumstances extraordinary in character. The argument is based for authority chiefly upon a *dictum* of Justice Story, in *Hobart v. Drogan,* 10 Pet. 122, 9 L. Ed. 363.

"None of the cases actually decided exemplify the application of any such rule. It is needless to restate their facts in detail. In none of them was there given to the claimants more than their transportation from the place of accident to their homes, and their sustenance, or such sums as would equal their sustenance, during that interval.

"But even this, meagre as it appears, is said by counsel to be a species of special salvage, and to illustrate the principle, if not the measure, of compensation that ought to be applied to the case under consideration. The argument has not won our concurrence. We do not doubt, that under the law, pre-existing the recent legislation of Congress, freight was regarded as the mother of wages, and upon the loss of freight, wages ceased. But though in that state of maritime law, transportation home, and sustenance during that interval, were not, in strict logic, the payment of wages, they need not, by that fact alone, be attributed to the enforcement of any doctrine recognizing special salvage. The feeling underlying these early decrees was the dictate of humanity that shrinks from leaving a shipwrecked sailor on a distant shore, and, in cases of such catastrophe, added to the obligation of the master to pay wages, the further obligation to bring his crew home. To reach such a result there existed no need to build up a doctrine of special salvage, or in other ways than the one object to be attained, break into the settled law of ship and crew.

"But though the argument be accepted, the element upon which it is based is wanting in the case under consideration. There was no abandonment of the steamer

'Bielman.' The seamen lost nothing by the loss of freight; for, under existing law, the running of their contract for wages continued. The service rendered, in lightering the vessel, was different, in degree only, from the usual service in boisterous weather. What appellants did, plainly was within their duty as seamen, and was therefore paid for by the wages stipulated in the articles of employment.''

The fourth exception is in case of recapture; which is not applicable here.

There has, however, grown up in admiralty a doctrine of compensation in the nature of salvage, which doctrine has been applied in some cases where the courts have been reluctant to close their eyes to acts of exceptional heroism and faithfulness in connection with extreme peril on the sea, but this recognition of merit 'serves as no exception to the general rule that seamen cannot become salvors of their own vessel, since salvage and compensation in the nature of salvage are dissimilar, not only in amounts, but in relation to the persons claiming them, salvage being awarded to one entitled to it as a matter of right, while the granting of the latter seeming to be a matter of discretion.

Counsel for appellants has cited in behalf of his argument that the appellants in this case are entitled to recovery in the nature of salvage some ten cases. Four of them will be found to be discussed in the *Minch* case, *supra,* and will be found to be cases of actual shipwreck and abandonment, and in cases where an abandonment was not found by the court, the libel was dismissed. Four of the remaining cases were cases of wreck and abandonment; one case seems to have no application here for the reason that salvage was allowed to sailors from a United States warship, who were not seamen on the wrecked ship and were, there-

fore, volunteers; and the last case seems to sustain the doctrine contended for by the appellants. An examination of these cases, which are: *The Dawn, supra; The Bowditch,* Fed. Cas. 1,717; *The Harvest,* Fed. Cas. 6,176; *Geiger v. The Mary Hale,* Fed. Cas. 9,213; *The Massasoit,* Fed. Cas. 9,260; *Mesner v. Bank,* Fed. Cas. 9,493; *The Niphon's Crew,* Fed. Cas. 10,277; *Reed v. Hussey,* Fed. Cas. 11,646; *Two Catherines,* Fed. Cas. 14,288; *O'Brien v. Umatilla,* 29 Fed. 252, shows that in nearly all of them the *Hobart* case, 10 Pet. 108, is referred to, where the United States supreme court, quoting Lord Stowell's definition of a salvor as "a person, who, without any particular relation to a ship in distress, proffers useful services, and gives it as a volunteer adventurer without any pre-existing covenant, that connected him with the duty of employing himself for the preservation of that ship," then says:

"   . . .   however harsh the rule may seem to be in its actual application to particular cases, it is well founded in public policy, and strikes at the root of those temptations, which might otherwise exist to an alarming extent, to seduce pilots and others to abandon their proper duty, that they might profit by the distresses of the ship, which they are bound to navigate."

These cases all involve services which were extraordinary and were rendered outside the scope of the seamen's contract, and cases where the ship was in fact wrecked and claims asserted against property actually salved from the wreck. But even though it might be admitted that, under certain circumstances, the work performed by the appellants would entitle them to compensation in the nature of salvage, the contract under which they were employed forecloses any such right. This necessitates an examination of those portions of the contract we have hereinbefore set forth.

These provisions of the contract are not, as claimed by the appellants, in any way conflicting or ambiguous.

They clearly cover the exact situation which the facts in this case disclose. By the contract, services such as were rendered by the appellants were not to be compensated for, and the appellants' only claim for compensation would be for salvage such as they would be entitled to in the absence of any contract. They have agreed that, when the vessel upon which they are seamen, or the property of respondent, might be endangered, they would do such work as would be necessary to protect it without extra compensation, and, further in section three that, in case of shipwreck or necessitated abandonment or lawful discharge, their wages should continue until such casualty or discharge, except for such men as are paid for the run, but that, if such disaster occur before the vessel has arrived at its destination, they should receive full run money, and in addition thereto salvage work should be paid for at the rate of one dollar per hour. This provision clearly indicates that the salvage work referred to was salvage as it is technically known in admiralty, that is, work done after shipwreck or abandonment or discharge, and § 25 clearly provides that no salvage should be paid or claimed except that provided for in § 3, to wit, salvage earned after shipwreck or abandonment or discharge. The facts in the case show no discharge, neither do they constitute a shipwreck or abandonment. The ship was in peril and the seamen performed strenuous and meritorious services, but when they undertook to go down to the sea in ships they accepted a hazardous occupation and assumed among their duties that of using their best endeavors to save their vessel and its cargo. They have lost nothing by reason of their arduous labors; their vessel proceeded upon its journey, and at its completion the full wages they had earned were paid them. Their ship never became a wreck without hope of recovery, nor was it abandoned

by all. The master authorized the crew to go ashore, but he did not thereby relinquish the hope of their ever returning to the vessel, and his whole object and intent was to secure her safety and their duty was to remain and assist in that endeavor. To hold otherwise would result, as indicated by the court in *Hall v. Land, supra*:

"It is not the mere leaving the ship by authority of the master that vacates the seamen's contract. In the case of shipwreck when the crew have reached shore, the seamen are not at liberty to refuse further exertion, and disperse themselves over the country; they are bound to remain by the wreck and assist in preserving the fragments. . . . If the rule of law which does not allow seamen to become salvors in the ordinary course of things, and while in the performance of their duties, whatever may have been the peril or hardships, or gallantry of their service in saving the ship and cargo, has any solid foundation in true policy, the same principle demands that they should not be permitted to assume that character on the ground that their contract has been vacated, except in extraordinary cases, where their relation to the vessel has been finally and unequivocally dissolved, and where the master has permanently renounced all hope of recovering or returning to her. Such is not the present case, and I am persuaded that I would violate the spirit which pervades the maritime law on the subject of the duties of seamen, if I should, under circumstances like the present, admit them as salvors. . . ."

The facts as they are alleged in the complaint do not entitle the appellants to salvage as such, nor to compensation in the nature of salvage, and the trial court was therefore correct in sustaining the demurrer to the complaint and dismissing the action, the appellants having elected to stand upon the complaint. Judgment affirmed.

PARKER, C. J., BRIDGES, FULLERTON, and HOLCOMB, JJ., concur.