[No. 16094. *En Banc.* June 21, 1921.]

## H. Heino *et al.*, *Respondents*, v. Libby, McNeill & Libby, *Appellant.*[1]

SEAMEN (2)—SHIPPING ARTICLES—CONTRACTS—"MERCHANT SHIPS" —WHAT LAW GOVERNS. A vessel engaged in domestic commerce between ports of one state and noncontiguous territory is a merchantman subject to the operation of maritime law, and the shipping regulations promulgated by the United States statutes.

SAME (2)—ARTICLES—PERFORMANCE OF CONTRACT—SURVEY—ABANDONMENT OF SHIP—SEAWORTHINESS—EVIDENCE—SUFFICIENCY. Where shipping articles are signed by men employed as seamen, fishermen, beachmen and trapmen, under a contract to sail a vessel from Seattle to a port in Alaska, work during the fishing season as fishermen, beachmen or trapmen, and at the close of such season sail the vessel back to Seattle, the contract as a whole is of a maritime character, notwithstanding the extra provisions covering fishery services.

SAME—WAGES—FORFEITURE. Seamen employed under shipping articles to sail a vessel on the return voyage from an Alaskan port to Seattle, have no justification for abandoning their contract on the ground of the unseaworthiness of the vessel, where a survey of the vessel was made by three disinterested master mariners, and also by a board of survey consisting of the commander of a U. S. coast guard cutter and three other officers of his ship, the surveyors in both instances finding the vessel seaworthy and fit to make the voyage from Alaska to Seattle; and their refusal to serve as seamen, without making any demand for a survey, constituted them deserters under the statutes of the United States.

SAME—WAGES—FORFEITURE—DESERTION. A deserting seaman not only forfeits his wages or emoluments which he has earned, but also forfeits the right to recover upon a quantum meruit for services rendered in part performance of his contract.

SAME—WAGES—ISSUANCE OF CERTIFICATES—EFFECT. Labor certificates issued to a crew of seamen and fishermen, stating the amounts that would become due them on fulfillment of their contract would not estop the employer to deny the right of recovery, where the certificates were secured by coercion after the crew had become deserters under their shipping contract.

FULLERTON, J., dissents.

[1]Not yet reported in Pacific Reporter.

Appeal from a judment of the superior court for King county, Smith, J., entered April 27, 1920, upon the verdict of a jury rendered in favor of the plaintiffs, in consolidated actions to recover seamen's wages, after a trial on the merits. Reversed.

*Kerr & McCord* and *Stephen V. Carey,* for appellant.
*H. E. Foster,* for respondents.

HOLCOMB, J.—These actions, ten in number, were brought by ten of a crew of seamen and fishermen, suing for themselves and as assignee for collection of eighty-four others, to recover wages claimed to have been earned by them under a contract of employment. The ten cases were consolidated for trial under the title of *Heino v. Libby, McNeill & Libby.* From six to twelve cases are included in each suit. In each suit the plaintiff alleges his employment and that of his assignors and that he was given certificates showing stated amounts which appellant refused to pay.

Appellant answered in each case, the answer in the *Heino* case being typical of all, denying that the several amounts claimed by the plaintiffs were earned, alleging that certain lesser sums were earned, which would be owing by appellant were it not for matters affirmatively alleged. Appellant then affirmatively alleged that, on April 8, 1919, respondents and their assignors entered into a contract with appellant in the form of shipping articles, and a certain supplementary agreement, whereby respondents and their assignors engaged themselves as seamen and fishermen for the season of 1919, and, as such, agreed to sail the ship "Abner Coburn" from Seattle to Libbyville, Alaska, and to work as fishermen during the fishing season, and on the conclusion thereof to sail the "Abner Coburn" back to Seattle. It is further alleged that, upon the arrival

of the ship at Libbyville, the crew conspired together to violate their contract by refusing to navigate the ship back to Seattle; that, in furtherance of the conspiracy, the crew pretended that the vessel was in a leaky condition and unseaworthy, and thereupon the appellant had the vessel surveyed by three master mariners, and by the officers of the United States coast guard cutter "Unalga"; but that, notwithstanding such surveys and the demand of the master that the crew fulfill their contract, they refused to do so, and deserted the ship. Appellant then alleged that, on account of the refusal of the crew to perform their contract, appellant was subjected to expenses aggregating something over $36,000, and by reason of the provisions of the contract, appellant became entitled to recover from each member of the crew $5 for each day they severally refused to work.

Respondents replied, putting in issue the matters alleged in appellant's affirmative answer.

The total amount claimed by the several respondents upon their own and the assigned claims was $26,029.22. Upon a trial to the court and a jury, the jury returned a verdict for $25,613.76.

Appellant operates a number of salmon canneries in Alaska on Bristol Bay, and one of the canneries is located at Libbyville, Alaska. The usual method of operating these canneries is to fit out an expedition, which leaves Seattle in the spring in time to reach the cannery by the time the fish begin to run. The canneries are operated during the run of the fish, and when that is over the expedition returns to Seattle. During the season of 1919, the sailing ship "Abner Coburn", owned by appellant, was assigned to the expedition to Libbyville. She left Seattle on April 10, 1919, having on board a cargo of cannery and fishery supplies and about 325 or 330 men. The men on board were under

contract to perform the labor and were divided into three groups, namely: (1) seamen, fishermen, beachmen and trapmen; (2) monthly men; (3) China crew.

The first group (seamen, fishermen, beachmen and trapmen) was composed of about one hundred men who, before leaving Seattle, signed shipping articles in the office of the United States shipping commissioner, by which they engaged themselves to sail the "Abner Coburn" to Alaska, work during the fishing season as fishermen, beachmen or trapmen, and at the close of the fishing season to sail the vessel back to Seattle. These men were all members of the Alaska fishermen's union. Their contract of employment consisted of the usual form of shipping articles prescribed by title LIII, Revised Statutes of the United States, to be executed with respect to vessels or merchant ships, together with a supplemental agreement known as a "fisherman's contract", which provides in detail as to the duties and compensation of these men. The two documents, namely, the shipping articles and the fishermen's agreement, were executed together and constituted one contract. The form of the fishermen's agreement is agreed to each year by representatives of the salmon packers operating in Alaska, and the officials of the Alaska fishermen's union, and the form so agreed to becomes the uniform contract applicable to all canneries in Alaska.

Under the agreement, the seamen and fishermen were entitled to certain fixed sums known as "run money", as compensation for sailing the ship to and from Alaska, together with further allowances depending upon the number and kind of fish caught during the season.

These cases concern only wages claimed to be due seamen and fishermen, the monthly men and China crew not being involved.

When the vessel left Seattle with its cargo of cannery supplies, it was loaded down to the 24 foot draught. When about seven hundred miles outside of Cape Flattery, nearly one-half of the distance to Unimak Pass, the ship encountered a squall which lasted about twenty-four hours, on about April 18, 1919, and began to take water, and took water to the extent of nine or ten inches per hour. Some of the crew then became alarmed and demanded of the master that he return to Seattle. A petition was circulated aboard ship and signed by many members of the crew, and monthly men, and presented to the master, making this demand, but he declined to turn back, being of the opinion that he could as safely go forward to Unimak Pass as to put back an equal distance to Seattle; for, on reaching Unimak Pass he could, if necessary, put into Dutch Harbor. After this squall, the vessel proceeded to Bristol Bay, not finding it necessary to stop at Dutch Harbor. Upon the master's refusal to put back, the crew became insubordinate, and for a time refused to set sail as ordered. The ship arrived at Bristol Bay about May 8, 1919, and proceeded to discharge her cargo. Although the vessel had leaked considerably on the voyage, the cargo was not damaged by water. From the time she started to leak, about April 18, until she arrived in Bristol Bay, she continued to take in more or less water, but the power pumps were always adequate to take care of the water and it was never necessary to operate the hand pumps.

When the vessel was partly unloaded, the leak was discovered at about the 19-foot draught line, and it was found that several butts had opened up, probably caused by the storm, and thus caused the vessel to leak. A "butt" is a joint between the ends of two planks on the side of the ship. The planks are about eight inches wide, and the space between the ends of

the two planks, about a quarter of an inch wide, is called a "butt" and is filled with oakum to make it water tight. The oakum had worked out of several of the butts. The unloading of the vessel had caused her to come up out of the water so that the leaking butts were exposed. When the vessel had been completely unloaded, appellant caused her to be overhauled and fitted for the return voyage, and, among other things, caused the leaking butts to be repaired.

When the crew arrived at Libbyville, they held a meeting and agreed among themselves that under no circumstances would they sail the ship on the return voyage, and so notified the superintendent of appellant's cannery. This determination was made by the crew before the vessel was unloaded and before it was known why she had leaked on the trip to Alaska.

After the vessel was repaired, appellant, on about July 8, caused her to be surveyed by three disinterested master mariners from other ships then in Bristol Bay, and as a result of their examination they pronounced the ship seaworthy and in all respects fit to make the return trip to Seattle.

On August 12, the ship was loaded and ready to make the return trip. The vessel did not have a full cargo for the return voyage, and as loaded for the return trip the butts which had leaked on the up trip were above water. The master then ordered the crew aboard for the return voyage, but because of the previous agreement among themselves, they refused to go aboard. The men were then assembled on shore, the master read to them the certificate made by the three master mariners, the roll of the crew was called, and each man individually asked to go aboard, and each individually refused to do so. In the meantime the general superintendent, Svenssen, of appellant, had arrived at Libbyville, and took charge of the sit-

uation. He had various consultations with the members of the crew endeavoring to get them to fulfill their contract, but without success. As a last resort he took steps to have the United States coast guard cutter "Unalga" sent to the scene of the trouble. Captain Dodge, commander of the "Unalga" was ordered by his superiors at Washington to go to Libbyville where he arrived with his vessel September 6. He immediately appointed a board of survey consisting of himself and three other officers of the ship. This board proceeded to survey the Coburn and, after a complete examination, pronounced her seaworthy and fit to make the voyage to Seattle. He then assembled the crew in a bunk house and informed them of the conclusions reached by himself and his officers, and endeavored to persuade them to make the return voyage, without success, the crew still persisting in their refusal to go aboard the vessel. On August 26, the fishermen's union headquarters at Seattle telegraphed to Selenius, "delegate" or representative of the crew, advising that the crew sail the vessel home because it had been certified to be seaworthy.

To induce them to go aboard Captain Dodge made various proposals to them. He offered to tow the Coburn to Unimak Pass and then convoy her the remainder of the way to Seattle, but the men refused to go aboard under these conditions. He offered to tow the Coburn all the way to Seattle if a sufficient number of her crew would go aboard to steer her on the trip down, which proposal was also refused. The men were at no time violent but simply stubbornly determined. That condition of affairs continued from September 6 to September 16, and by that time bad weather was approaching and it was necessary to do something to get the men out of the country. Finally Captain Dodge made an arrangement whereby he took the crew

aboard his own vessel, the "Unalga," and towed the Coburn with the monthly men to Dutch Harbor, where he arrived on September 17. The Coburn made the voyage from Libbyville where she left on September 15, to Unalaska, Dutch Harbor, without any difficulty whatever.

The seamen and fishermen were quartered on shore at Dutch Harbor until October 12, when they were put aboard a steamer, together with the China crew, and sent to Seattle, appellant advancing the transportation charges.

Shortly after the departure of the steamer with these men aboard, the "Unalga" sailed from Dutch Harbor leaving the Coburn there. Appellant failing in its efforts to procure a crew to sail the Coburn, was compelled to have her towed by steamer "Cordova" to Seattle, where she arrived on November 12. The master and monthly men made the trip on the Coburn from Libbyville to Dutch Harbor, and thence to Seattle and the vessel leaked but an inconsequential amount on the trip down, and discharged her cargo at Seattle without any damage. The proof shows that a wooden vessel will leak more when being towed than when being sailed.

During the trip from Libbyville to Dutch Harbor, when the Coburn was towed by the "Unalga," a distance of four hundred fifty miles, Lieutenant Anderson, a subordinate of Captain Dodge of the "Unalga" was put aboard the Coburn to keep Captain Dodge informed of the conditions aboard the Coburn, and no leaking or other trouble was reported to Captain Dodge.

While at Libbyville and on September 12, Captain Dodge made an agreement with the representatives of the fishermen and beachmen whereby it was agreed that safe transportation should be furnished the fishermen

and beachmen from Libbyville to Unalaska, and from
Unalaska to Seattle on a seaworthy vessel, excluding
the "Abner Coburn", and that all expenses were to be
paid by Libby, McNeill & Libby from the time the men
left Libbyville until they arrived at Seattle. This
agreement the men who represented the fishermen,
beachmen and others, testified was authorized by Cap-
tain Svenssen, the general superintendent of appellant,
and also declared by him to have been by and with
his authority, representing appellant. Captain Dodge
and Captain Svenssen, however, both testified that the
agreement was not authorized nor ratified by Captain
Svenssen, or the appellant. Captain Dodge testified
that it was made under the stress of the circumstances
existing at the time, because it was absolutely neces-
sary that the men be gotten out of Libbyville and that
region at once or they could not be gotten out at all
during the winter, and would suffer great hardships
and privations. On the arrival of the Coburn in Se-
attle, this agreement was repudiated by appellant
whose officers insisted that the crew had violated their
agreement and that appellant would stand strictly
upon the contract between it and the men.

Prior to the sailing of the ship from Seattle, she was
surveyed by a representative of the San Francisco
board of marine underwriters, who was a master
mariner of over thirty years experience, and who
found her fit for the voyage, and issued a certificate
to that effect. After her return to Seattle from this
voyage she was again surveyed by the same representa-
tive of the underwriters, and found practically tight
and seaworthy and the cargo came out in good con-
dition.

It is not necessary to set forth the contract between
appellant and the men in full, for it is exactly such a
contract as was held by this court in *Danielson v. Libby,*

*McNeill & Libby,* 114 Wash. 240, 195 Pac. 37, to come within the designation of "Seaman's Contract" and governed by maritime law.

Respondents assert that the "Abner Coburn" was not a merchant ship and therefore not governed by the laws applicable to merchant ships. They argue that "appellant has not advised the court whether it is claiming under the 'Harter Act' (Federal Statutes) or claiming simply for reasons that are historic. This expedition was not launched under any provisions of the laws of the United States. It was simply a private enterprise for private pursuits."

The "Harter Act" alluded to by respondents in no way applies to this matter. That act was an act of Congress of February 13, 1893; 27 Stat. L. 445. It provides that agreements added to bills of lading relieving the owner, etc., of a vessel sailing between the United States and foreign ports from liability for negligence in proper loading, stowage, custody, care or proper delivery of merchandise, are void. That no bill of lading shall contain any agreement whereby the obligations of the owner to exercise proper diligence, properly equip, man, provision, and outfit such vessel and to make such vessel seaworthy and capable of making the intended voyage, or to relieve the master, etc., of the vessel from carefully handling and stowing her cargo, and properly to care for and deliver the same; nor shall the vessel, her owner or owners, charterers or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God or public enemies, or the inherent defect, quality, or vice of the thing carried, or for insufficiency of package or seizure under legal process, or for any loss resulting from any act or omission of the shipper or owner of the goods.

It will thus be seen that the act applies only to liabilities and immunities of carriers to shippers of merchandise.

The "Abner Coburn" was not a ship of war, nor a police patrol vessel, nor a private pleasure yacht, but was engaged in domestic commerce between ports of the state of Washington, and noncontiguous territory and was therefore a merchantman.

"A ship or vessel employed in foreign or domestic commerce and in the merchant service is a merchant-man." Black's Law Dictionary, 773.

The owner and master of the ship would have been subjected to penalties had they not complied with the shipping regulations provided by the United States statutes, title LIII, and the men were protected in their rights by those same statutes.

Moreover, it has become indisputably established that such a contract as the one before us is of a maritime character. In *Domenico v. Alaska Packers' Assn.*, 112 Fed. 554, a similar contract by men "to act as seamen on a voyage to and from the salmon fishing grounds in Alaska, to work as fishermen during the season, assist in canning the fish on shore, and loading them on board for transportation," is one maritime in its nature. The court there observed:

"It will be noticed that the principal subject of the contract upon the part of the libelants was for the rendition of services as fishermen at Pyramid Harbor, and included work in the cannery on shore, in preserving the fish caught by them, and also the labor of placing the fish on board the Two Brothers for transportation to San Francisco. The contract is, however, maritime in its nature. The fact that, while engaged in fishing at Pyramid Harbor, the libelants slept on shore and mended their nets and cared for the fish on shore, and that this was contemplated by the contract, does not make it any the less a maritime contract which a court of admiralty has jurisdiction to enforce."

This case was affirmed by the circuit court of appeals for the ninth circuit, in 117 Fed. 99. And the same kind of a contract in *North Alaska Salmon Company v. Larson,* 220 Fed. 93, 135 C. C. A. 661, was held to be a maritime contract. Benedict's Admiralty (4th ed.), § 143 was quoted to the effect that, "if a contract is maritime in itself it carries all its incidentals with it, and the latter, though nonmaritime in themselves will be heard and decided." The same rule was declared in *Union Fish Co. v. Erickson,* by the circuit court of appeals, ninth circuit, 235 Fed. 385, which was affirmed by the United States supreme court in the same case on certiorari, 248 U. S. 308, in which the principle was declared that, "those who pursue commerce and put to sea are subject to the maritime law."

The contract being maritime, these respondents and their assignors had a right, if they desired, to bring their suits in admiralty in a United States district court. But they had the alternative right to sue at common law in a common law court by virtue of the third subd. of § 24, of the United States judicial code, which provides that district courts of the United States shall have jurisdiction of admiralty or maritime actions, "saving to suitors in all cases the right of a common law remedy where the common law is competent to give it." But it is well established that although the respondents had the right to sue in admiralty, and had an alternative right to sue in common law actions in the state courts, their reciprocal rights, duties and obligations are governed by the rules and principles of admiralty law. *The Osceola,* 189 U. S. 158; *Chelentis v. Luckenbach S. S. Co.,* 243 Fed. 536. In the last case, in the opinion of the circuit court of appeals, it was declared:

"The contract of a seaman is maritime and has written into it those peculiar features of the maritime

law that were considered in the case of *The Osceola,* supra; and although because of these peculiarities such contracts are almost invariably litigated in admiralty courts, still the contract must be the same in every court, maritime or common law.''

In reviewing the decision of the circuit court of appeals in the above case, the opinion of the supreme court of the United States, 247 U. S. at p. 384, stated:

''The distinction between the rights and remedies is fundamental. A right is a well founded or acknowledged claim; a remedy is the means employed to enforce a right or redress an injury. Bouvier's Law Dictionary. Plainly, we think, under the saving clause a right sanctioned by the maritime law may be enforced through any appropriate remedy recognized at common law; but we find nothing therein which reveals an intention to give the complaining party an election to determine whether the defendant's liability shall be measured by common law standards rather than those of the maritime law. Under the circumstances here presented, without regard to the court where he might ask relief, petitioner's rights were those recognized by the law of the sea.''

In *Knickerbocker Ice Co. v. Stewart,* 253 U. S. 149, the supreme court of the United States cites and quotes the above cited cases, and others, quoting the *Erickson* case in 248 U. S. 308, to the effect that,

''In entering into this contract the parties contemplated no service in California. They were making an engagement for the services of the master of the vessel, the duties to be performed in the waters of Alaska, mainly upon the sea. The maritime law controlled in this respect, and was not subject to limitation because the particular engagement happened to be made in California. The parties must be presumed to have had in contemplation the system of maritime law under which it was made.''

And in the case last cited, the supreme court further said:

"As the plain result of these recent opinions and the earlier cases upon which they are based, we accept the following doctrine: The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law, and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction. Moreover, it took from the states all power, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations. To preserve adequate harmony and appropriate uniform rules relating to maritime matters and bring them within control of the federal government was the fundamental purpose; and to such definite end Congress was empowered to legislate within that sphere."

Appellant, upon those terms, contends that, as a matter of law, the crew had no right to set up their judgment as against the judgment of the master confirmed as it was by disinterested independent surveys. That the contentions of the crew were purely obstinate, unreasonable and not in good faith, to the effect that the ship was not seaworthy for the return voyage, and that, agitated by their constituted agent or agents, they entered into the ill-advised agreement, not, under any circumstances, to return on the "Abner Coburn" regardless of its real condition, regardless of any surveys and certificates as to the seaworthiness of the vessel, and stubbornly adhered to it as a body, and therefore became deserters.

On the other hand, respondents contend that the seaworthiness of the vessel was a fact to be determined by the jury as any other fact, and that the evidence justifies the verdict of the jury that the vessel was

not seaworthy, and therefore justified the men in discharging themselves at Libbyville, Alaska, and refusing to return on her, and that furthermore, under their contract the men had a perfect right to quit the employ of the company at any time, referring to subdivision "f" of § 12 of the supplemental contract between the men and appellant.

Subdivision "f" of § 12 of the supplemental contract is as follows:

"(f)  A fisherman refusing to go fishing or work otherwise shall be considered as having quit the employment of the company, and shall be paid in accordance with § 18, and the company released from all further obligations to him."

Section 18 is as follows, so far as here material:

"(b)  Any man who is discharged, or who quits shall be paid only half run money and all his other earnings, including for the day of discharge or quitting. If no substitutes are hired to take the place of a quitting or discharged man, the run money so deducted shall be equally divided among all the men of the cannery signing this contract.

"(c)  Men discharged shall be given free transportation to home port, including maintenance, but this obligation shall not apply to men quitting."

We cannot perceive how the above quoted portions of the contract in any way justify the men. They had, under this contract, no right to quit as a body by colluding and combining together in order to bring about the abandonment of the ship or the enterprise on which the ship was engaged, and if they quit singly, and without cause, they had no right to more than one-half the "run-money" or remaining compensation, nor to transportation back to Seattle, under the provisions of the contract.

Being governed by maritime law, as before seen, the men have no right to conspire together to abandon the

ship and its enterprise before the voyage is completed. They signed up for the voyage from Seattle to Libbyville, and any other ports in Alaska which the master might see fit to touch, and for the salmon fishing season of 1919, and to return by the same ship, and man the ship from Libbyville to Seattle, at the end of the season. Thus, the duration of the voyage was fixed by the contract. When the ship landed at Libbyville, the voyage was not complete. Shore duties were then required of some of the crew, and when the fishing season was completed, sea duties were again required of them to return the ship to Seattle. Although the ship may have appeared to them to be in a dangerous condition on the first half of the voyage, that from Seattle to Libbyville, its safe arrival at Libbyville proved that the fears of the crew were unfounded. It is almost indisputably established that the ship was put in a seaworthy condition for the return trip, if it had ever been in an unseaworthy condition, and the master and the monthly men risked their lives upon the ship for the return trip to Seattle, although under tow because of not having a crew to handle it (which method of handling would have made it leak more than if sailed by the crew), and arrived in Seattle, with the cargo, safely.

In the *C. F. Sargent,* 95 Fed. 179, the crew had shipped as seamen for a voyage from Tacoma to Honolulu and thence to San Francisco, before their final discharge, either direct or by way of one or more ports on the Pacific Coast. Proceeding from Tacoma to Honolulu, where the cargo was discharged, the vessel returned in ballast from Honolulu to Seattle where a cargo was taken on for San Francisco. After the cargo was loaded at Seattle the crew left the vessel, claiming that she leaked and was unseaworthy. They then libeled the ship for their wages. The evidence showed

that the vessel was in a leaky condition on the trip from Tacoma to Honolulu, and that it was necessary for the crew to perform considerable labor in manning the pumps, but she reached Honolulu in safety, and on the return voyage to Seattle, when light, she took in but little water. At Seattle the leak was located and repaired and a certificate of seaworthiness was given by the agent of the underwriters. The United States district court, sitting in admiralty, said:

"Under the circumstances shown by the uncontradicted evidence, the seamen were not authorized to determine the question as to the seaworthiness of the ship, and they cannot be relieved from their obligations to perform their contract under the shipping articles which they have signed, on the ground of unseaworthiness. If they in good faith believed that it was unsafe for the ship to go to sea, they might have demanded a survey, which, if fairly made by competent persons, would be treated by the court as conclusive for the purpose of determining whether the men should or should not be discharged before completion of the voyage."

It will be observed that the above case holds that, on the question of the seaworthiness of the ship, the men should not be relieved from their obligations to perform their contract on the ground of unseaworthiness unless they demanded a survey, and that if the survey was fairly made, by competent persons, it would be treated by the court as *conclusive* for the purpose of determining whether the men should or should not be discharged before the completion of the voyage. In this case the men did not demand a survey; but two surveys, which appear to be fair, and made by entirely disinterested and competent persons, were made, as to the seaworthiness of the Coburn, and the results thereof made known to the men, who refused to be bound by them.

In *The Condor,* 196 Fed. 71, the district court said:

"A judge should, of course, be careful not so to construe the law as to force the crew to risk their lives on an unseaworthy ship; but, on the other hand, if they may finally choose, without subsequent question, to regard any injury to the ship as absolving them from further service, the condition of their master will be quite helpless. Here they probably knew the actual fact that no crew could be got nearer than Valparaiso. The situation was not, so far as I can see, that of a crew harshly held to a bargain now become dangerous, but of one, not sincerely afraid, but attempting to exploit the necessities of their master. If so, it is surely a very dangerous practice to encourage, and one which directly promotes insubordination and mutiny. Discipline on the sea is not like that on the land in ordinary industrial employments. The relations between master and man requires an authority which is not necessary when both parties have immediate recourse to constituted authority. No doubt countless misery and brutality has arisen from the exercise of master's authority; but the substance of that authority still remains in civilized countries, and must remain if men are to put to sea for weeks, out of reach of the usual methods of keeping order.

"So long as a master does what he can to obtain impartial outside opinion, acts within reasonable bounds of a fair judgment, and trusts his life upon the venture equally with his men's, his decision must control as to whether the voyage shall break up, and the whole ship's company is bound by it. To hold otherwise is to imperil his authority and the whole safety of ships and those upon them."

Under § 8345 (title LIII) United States Compiled Statutes, 1918, it is provided that first and second officers under the master, or a majority of the crew of any vessel bound on any voyage shall, before the vessel shall have left the harbor, if it is discovered that the vessel has a leak or is otherwise unfit in her crew, body, tackle, apparel, furnishings, provisions or stores, to

proceed on the intended voyage, require such unfitness to be inquired into, the master, upon request of the first and second officer under the master, or such majority of the crew, forthwith apply to the judge of the district court of that judicial district, if he shall there reside, or, if not, of some justice of the peace of the city, town or place, for the appointment of surveyors, taking with him two or more of the crew who shall have made such request, and providing a penalty for failure to comply with such demand; and § 8346 *supra,* provides that the judge or justice in the domestic port shall upon such application of the master or commander, issue a precept directed to three persons in the neighborhood, the most experienced and skillful in maritime affairs that can be procured, to make a survey of the matters complained of. Section 8347, *supra,* provides that if, "after judgment that such vessel is fit to proceed on her intended voyage, . . . the seamen, or either of them, shall refuse to proceed on the voyage he shall forfeit all wages that may be due him."

It is not in the record whether or not there was any judge of the United States district court or any justice of the peace of a city, town or place, residing at Libbyville where the ship was in harbor. At any rate, a majority of the crew, as provided by statute, never demanded any survey by competent and disinterested persons in that harbor. The surveys procured by appellant were undoubtedly disinterested and competent, fairly made, and procured in good faith by appellant, from humanitarian as well as legal motives. Such being the case, when the men in a body refused to return to the ship and actually abandoned and deserted her, they must either be held to a strict performance of the contract, or they are amenable to the statute applying in such cases which makes them deserters, reading as follows:

"Whenever any seaman who has been lawfully engaged or any apprentice to the sea service commits any of the following offenses he shall be punished as follows:

"First: for desertion by forfeiture of all or any part of his earnings, board and clothes, and of all or any part of the wages, or emoluments which he has then earned."

Desertion by a seaman in law consists in quitting the ship and her service without leave and without justifiable cause, and with intent not to return to his duty. *The Mary C. Conery,* 9 Fed. 222; *The William H. Clifford,* 165 Fed. 59. And by general martime law as well as by statutes desertion is followed by forfeiture of all wages earned. *The Mary C. Conery, supra;* the *C. F. Sargent,* 95 Fed. 179.

"And a deserting seaman is not even entitled to recover upon a *quantum meruit* for services rendered in part performance of his contract." *The Liederhorn,* 99 Fed. 1001 (syllabus).

Upon the above stated facts and the foregoing principles of maritime law, appellant requested that the verdict of the jury be directed in favor of appellant, which was refused.

Upon the submission of the case to the jury, the trial court instructed the jury as follows:

"If seamen find that the vessel is unseaworthy and they have reason to believe that she is so unseaworthy as to endanger their lives at sea, and they in good faith do so believe, they may lawfully refuse to go to sea on her. Both law and reason require that a vessel shall be seaworthy before seamen are bound to go aboard her, and navigate her at sea. If you believe from a preponderance of the evidence that when the Coburn was prepared for the return trip to Seattle she was in such condition that ordinarily prudent seamen had reason to apprehend imminent danger; that she could not be navigated upon the sea without danger

to the lives of the men, and that the seamen did so believe in good faith, and had reasonable grounds for their belief, then they would be justified in refusing to sail the vessel to Seattle, and they would be entitled to receive the compensation to which they were entitled upon their certificates when adjusted and settled.''

The above instruction entirely disregards the uncontradicted evidence, that while the vessel had leaked on the voyage up she had been repaired, and had been surveyed by disinterested and competent master mariners, and found to be seaworthy for the return trip, and was obviously not in the same condition as she was in on the trip up after the storm of April 18, and that the seamen had not complied with the law of the sea that they should demand a competent survey of the vessel as to seaworthiness, and that they had obdurately, in the face of all the facts as to the seaworthiness of the ship for her return trip, refused to return in her, thereby evidencing not good faith, but bad faith and unreasonableness. On the contrary, under the laws of the sea, or maritime law, the jury should have been instructed, if the case was submitted to the jury at all, as requested by appellant:

''Seamen are not authorized to determine for themselves the question of the seaworthiness of their ship. If they in good faith believe the ship is unfit to go to sea, they may, before leaving the harbor, demand a survey and if that survey is fairly made, by competent persons, such survey must be treated as conclusive for the purpose of determining whether the seamen should or should not proceed on the voyage.''

And the jury should further have been instructed, if the case were submitted to it, that,

''If the crew, notwithstanding the opinion of the master that the ship was in fact seaworthy, had reasonable grounds to believe the contrary, the master was not compelled to do more than to do what he could

under the circumstances to obtain an impartial survey by other competent persons, and if, when the dispute arose between the master of the 'Abner Coburn' and her crew as to the seaworthiness of the vessel, the master did do what he could to obtain an impartial survey by other competent masters, and that such other competent masters pronounced the ship seaworthy, such survey became binding and conclusive upon the crew, and if the crew then persisted in refusing to go aboard the ship in obedience to the master's orders, they became deserters and subjected themselves to the forfeitures provided by law for cases of desertion.''

But we are convinced, under the law and the facts governing this case, that the crew of the Coburn wilfully and unreasonably acted upon their own opinion as to the seaworthiness of the vessel to make the return trip to Seattle; refused to be governed by the disinterested and ·independent surveys made by competent master mariners; refused to go aboard the ship in response to the master's order; demanded no survey by impartial persons competent to make such survey, and wilfully refused to make the return voyage to Seattle without just cause or reason; and under such circumstances they became deserters. Such being the case they forfeited their wages and all emoluments then earned.

Respondents contend, however, that appellants are bound by the fact that they issued to the men labor certificates in Alaska, before the men returned, for the amount of the wages which would become due them for the voyage, and having sued on these certificates, the company is estopped to deny their right of recovery. These labor certificates were issued by the company's officers and agents in Alaska, stating the amounts which would become due the men if the contract were fulfilled, and that they were issued under protest as having been coerced from the company's

officers and agents by the conduct of the men in Alaska. This contention is undoubtedly borne out by the testimony of the company's officers and agents, and Captain Dodge of the United States coast guard cutter "Unalga," and all the circumstances surrounding the transaction. A somewhat similar situation existed in *Domenico v. Alaska Packers Ass'n.*, 112 Fed. 554, cited in this opinion, upon other matters, wherein the libelants undertook to show that certain apparatus provided by the respondent were defective, and on that account they demanded increased wages. Sustaining the contention of the libelants the court held that:

"Where a person who has bound himself by contract to render services refuses to do so unless paid more than the contract price, the parties may enter into a new contract by which an increase in compensation is to be paid for the same service, and in such case the subsequent performance of the contract by the promisee is sufficient consideration for the new agreement, and where persons who have contracted to render services refuse without lawful excuse to perform the same unless paid a greater compensation, the employer has his election to sue for damages for breach of the contract, or to enter into a new and substituted contract for the payment of the compensation demanded; and the fact that the former remedy is worthless because the employees are not able to respond in damages, and the employer is induced thereby, and to save himself from greater loss, to yield to the demands of the employees and agree to pay a higher compensation for the same service does not constitute duress which will render the new contract invalid."

But on appeal to the circuit court of appeals for the ninth circuit, that court, in 117 Fed. 99, disagreed with the district court, saying:

"After having entered upon the discharge of their contract and at a time when it was impossible to secure other men in their places, the libelants, without any

valid cause, absolutely refused to continue the services they were under contract to perform, unless the appellant would consent to pay them more money. Consent to such demand under such circumstances, if given, was, in our opinion, without consideration, for the reason that it was based solely upon the libelants' agreement to render the exact services and none other, *that they were already under contract to render* (italics ours). The case shows that they willfully and arbitrarily broke that obligation. As a matter of course they are liable to the appellant in damages, and it is quite probable, as suggested by the court below in its opinion, that they may have been unable to respond in damages. . . . . Certainly it cannot be justly held upon the record in this case that there was any voluntary waiver on the part of the appellant of the breach of the original contract.''

*King v. Railway Co.*, 61 Minn. 482, 63 N.W. 1105, is cited and quoted as follows:

''No astute reasoning can change the plain fact that the party who refuses to perform, and thereby coerces a promise from the other party to the contract to pay him an increased compensation for doing that which he is legally bound to do, takes an unjustifiable advantage of the necessities of the other party. Surely it would be a travesty on justice to hold that the party so making the promise for extra pay was estopped from asserting that the promise was without consideration. A party cannot lay the foundation of an estoppel by his own wrong, where the promise is simply a repetition of a subsisting legal promise. There can be no consideration for the promise of the other party, and there is no warrant for inferring that the parties have voluntarily rescinded or modified their contract. The promise cannot be legally enforced, although the other party has completed his contract in reliance upon it.''

The opinion also cites and quotes from *Lingenfelder v. Wainwright Brewing Co.*, 103 Mo. 578, 23 Am. St. 900, to the same effect, and distinguishes and rejects a number of cases cited counter thereto and cites a num-

ber of cases to sustain the holding of the circuit court of appeals in the case quoted.

We are of the opinion that the reasoning and decision in the above case by the circuit court of appeals are controlling in this analogous situation.

Here, the men deserted and abandoned the ship and its enterprise in a body, at a remote point where other men could not be obtained to continue the enterprise and voyage, and where, from humanitarian motives alone, it was absolutely impossible to evade the duty of returning the men from that region to the initial port; and because they unanimously abandoned and deserted the ship and refused all efforts to persuade them to perform their duty and fulfill their contract, they compelled the appellant to give them certificates of labor performed while in Alaska or on the voyage thereto, and to furnish them maintenance and transportation out of that region; all of which constituted duress of the most forceable kind, and gives no validity to the labor certificates issued in Alaska, or to recovery upon the original contract wilfully forfeited and abandoned by the men themselves.

Therefore, although mindful that we "should be careful not to so construe the law as to force a crew to risk their lives on an unseaworthy ship," we are convinced by the record in this case, and the law applying, that appellant did everything in its power to humanely care for these men, and paid out a great deal of money in excess of their contract pay, on account of their unreasonable, obstinate and arbitrary conduct, and that the men forfeited and are not entitled to recover their wages. The jury should have been instructed to render a verdict for appellant.

The judgments are reversed and the cases dismissed.

Parker, C. J., Tolman, Main, Mackintosh, Bridges, and Mitchell, JJ., concur.

FULLERTON, J. (dissenting)—This is an action brought by the respondents, who were plaintiffs below, to recover upon a written contract for services performed. The cause was tried in the court of its origin by a jury, who found that the plaintiffs and their assignors had earned under the contract sums aggregating $25,613.76, and judgment was entered in their favor for these sums. This court, in the foregoing opinion, does not question the finding of the jury as to the amount earned by the plaintiffs under the contract, but finds, contrary to the finding of the jury, that there was a breach of the contract, and as matter of law concludes that because of the breach there has been a forfeiture of the sums earned, and directs that there be no recovery. The sum stated represents practically a year's earnings of nearly one hundred men, and the effect of the holding is to take from them this considerable sum and vest it in the defendant, their employer. I can but believe the result is due to the application of erroneous principles of law, and I feel justified, because of the importance of the case to the plaintiffs, in stating, although somewhat at length, the grounds for my belief.

In the first place, I think the majority have placed a construction upon the contract that it cannot legally bear. It is held that the contract is one and entire, that it is in its effect the same contract that a seaman enters into when he binds himself to a vessel to serve as a seaman thereon for a stated period, or for a given voyage, and that the same rigorous rules are applicable thereto that are applicable to the ordinary seaman's contract. With this I cannot agree. As shown by the opinion, the contract consisted of two parts, the one entirely separable and distinct from the other. The first part consisted of ordinary shipping articles by

which the plaintiffs agreed to act as seamen in sailing the vessel, "Abner Coburn," from the port of Seattle in the state of Washington to the defendant's cannery, on Behring Sea, in the territory of Alaska, and to act as seamen in sailing the vessel on its return voyage at a later period. In the second part of the contract, they agreed to catch salmon for the defendant in the waters adjacent to the cannery during the period of the salmon run. For the performance of the first part of the contract, they were each to receive certain stated and definite sums, measured by the capacity in which they acted; and for the performance of the second part, they were to be paid a price for the number of fish caught and delivered, the price varying according to the variety of the fish.

The first part of the agreement may be essentially maritime in its nature, and it may be that the ordinary shipping articles were necessary to be entered into before its performance was entered upon. But it is clear to my mind that the second part of the agreement was in no sense maritime as that term is understood in admiralty. No shipping articles were necessary to be entered into by any one as a condition precedent to its performance. In fact, the present record shows that a number of persons engaged in fishing along with the plaintiffs who did not and who were not asked to sign the shipping articles. But more than this, the business from its nature cannot be maritime. In a maritime contract the person agrees to serve as a seaman on a vessel engaged in commerce as a common carrier for a given period of time or for a given voyage. In the other, the work is not performed on a common carrier. The fishing is done in small boats operated by the fishermen themselves; the boat engages in no form of trade, and the work involves no element of public interest, but is purely of a private nature. It seems to

me to follow conclusively from these differences that the breach of one part of the contract cannot be a breach of the other, and if the majority are correct in holding that there was a breach of the contract to navigate the vessel, and that because of the breach the plaintiffs have forfeited their right to the compensation agreed to be paid for that service, they are in error in holding that the breach operates as a forfeiture of their earnings under the second part of the contract.

The cases cited by the majority, as I read them, do not sustain the contrary conclusion. In none of them was the particular question raised or discussed. The cases are, for the most part, all instances where the plaintiffs, suing on the contracts, brought their suits in the admiralty courts, and where objection was made to the jurisdiction of the court because the contracts were not maritime in character. The jurisdiction was sustained on the theory that a contract, maritime in part, carries its incidentals with it, and the latter though non-maritime will be heard and decided. It was not, however, decided in any of the cases that the rules applicable to the maritime part of the contract will be applied in determining the issues not maritime, much less was it decided that a breach of the maritime part of the contract, although sufficient to work a forfeiture of wages earned thereunder, would work a forfeiture of the earnings under that part of the contract essentially non-maritime.

In the next place, I think the majority have given an unwarranted effect to the so-called surveys made of the vessel while it was at anchor at the cannery in Behring Sea. It is true that the Federal statute provides for a survey of a vessel when a majority of the crew may deem it unseaworthy for any cause, and further provides that if upon such a survey the vessel is pro-

nounced seaworthy any seaman who refuses to proceed on the voyage shall forfeit all wages that may be due him. But the statute also provides the manner of selecting the surveyors, and enough appears in the majority opinion to show that the statute was not in this respect even substantially pursued. The survey therefore had no official sanction. Legally, the findings of the surveyors were nothing more than the expressed opinions of private individuals. I am aware that the majority say that these surveys "were undoubtedly disinterested and competent, fairly made and procured in good faith by the" defendant; but, conceding that the evidence justified the statement, I am unable to understand just what it signifies. The defendant is claiming the right in virtue of a statute to forfeit to itself a large sum of money which belongs to the plaintiffs, and certainly it is no hardship to say that, before it is permitted to do so, it show a strict compliance with the statute. Forfeitures are never favored. It is only where the inflexible rules of law will permit of no other course that they will be granted. Here, I may repeat, there was no compliance nor attempted compliance with the statute. Since the right of forfeiture, in so far as this branch of the case is involved, depends upon the statute, I can but think the majority in error in holding that the surveys justify an adjudication of forfeiture.

And here I may properly notice the further holding that seamen are not authorized to determine for themselves the question of the seaworthiness of their ship. This is not an absolute rule. Its application depends upon circumstances. If the vessel is in a port where the ordinary processes of government are functioning, seamen who believe the vessel in which they are required to sail is unseaworthy, are by statute required to demand a survey, and if the survey is made in ac-

cordance with the terms of the statute, the seamen are concluded by it. But the rule has no application to conditions such as were here shown. The vessel was on a bleak, uninhabited coast, hundreds of miles from any place where organized form of government existed. Contrary to the statement in the majority opinion, the record does show that there was no judge of the United States district court, or justice of the peace residing at Libbyville to whom application for a survey could be made. One of the defendant's own witnesses expressly testifies that there were no others at the cannery except the cannery people. By the terms of the statute, the officers named are the only persons authorized to appoint surveyors. To apply for a survey would have been a useless procedure on the part of the seamen, and seamen, no more than any other class of persons, are required to do useless things in order to preserve their rights. Their rights, therefore, to determine the seaworthiness of the vessel stood as they did stand prior to the enactment of the statute, and what these rights were is stated by Judge Curtis in *United States v. Nye,* Fed. Cas. No. 15,906, in the following language:

"I think the correct rule is, that after the men have rendered themselves on board, pursuant to their contract, and before the voyage is begun, they may lawfully refuse to go to sea in the vessel, if they have reasonable cause to believe and do believe the vessel to be unseaworthy. But the presumption is that the vessel was seaworthy; and the seamen must prove that they acted in good faith and upon reasonable grounds of belief that the ship was not in a fit condition to go to sea by reason of unseaworthiness. If they prove this, they are justified in their refusal."

Again, I am unable to agree with the majority in the assumption that the facts of the case are before us for decision. These facts are important. For example, it is found on conflicting testimony that the agreement

made at the cannery after the close of the work to transport the crew from the cannery to Unalaska, and from Unalaska to Seattle on a seaworthy vessel at the expense of the defendant, was not authorized by the defendant or any of its authorized agents; it is found on conflicting testimony that the seamen wrongfully conspired together for the purpose of bringing about an abandonment of the ship, or the enterprise on which the ship was engaged; it is found on conflicting testimony that the ship, by the repairs made upon it by the carpenter while at the cannery placed the vessel in a seaworthy condition; it is found on conflicting testimony that the labor certificates, showing the amount of the earnings, were issued under coercion; and finally it is found that the plaintiffs deserted and abandoned the ship at a remote point where other men could not be obtained, and that because of these and other facts, the men became deserters.

In my opinion these were facts which this court is without power to determine on conflicting testimony; that they were questions for the jury in the court below, and that their findings on them are conclusive upon this court. As stated in the majority opinion, the United States judicial code does not give exclusive jurisdiction to the admiralty courts in maritime causes. The act saves "to suitors in all cases the right of a common law remedy where the common law is competent to give it." There is no question here that the common law can give the remedy. If this were not true this court should dismiss the action for want of jurisdiction, not reverse it and direct a judgment for the defendant. Since the act saves to suitors the common law remedy, it saves to them the remedy as it is usually administered at common law. One of the oldest of these remedies is to have the facts of the controversy determined by a jury, and I can conceive of no reason,

certainly none is stated by the majority, why the plaintiffs did not have the same right in this cause as they would have in any other cause triable in a common law court, to have the facts of the cause determined by a jury. The conclusion reached by the majority on the question is, moreover, contrary to our holdings in the cases of *Larson v. Alaska Steamship Co.*, 96 Wash. 665, 165 Pac. 880, L. R. A. 1917F 671, and *Sandanger v. Carlisle Packing Co.*, 112 Wash. 480, 192 Pac. 1005. These were actions for personal injuries suffered by seamen, due to defects in the equipment of the vessels on which they were sailing. One of the questions submitted in each of the cases was whether the remedy of admiralty or the remedy of the common law should be applied. The court held in each case, ''that the common law courts of a state have jurisdiction concurrent with the Federal courts when proceeding *in personam*, and that the state court will grant the relief that a common law court would have granted had the case been originally triable in such court,'' and applied the remedy of the common law, although the remedy differed from that afforded in admiralty. The majority do not notice these cases, but I can see no way in which they can be reconciled with the rule now announced, namely, that the saving clause in the statute confers only ''an alternative right to sue in common law actions in the state courts,'' and ''that the reciprocal rights, duties and obligations of the parties are governed by the rules and principles of admiralty law.''

As I have before indicated, the ultimate question for the determination of the jury was whether or not the plaintiffs had reasonable cause to believe that the vessel was unseaworthy at the time they refused to return upon her. This issue they found in favor of the plain-

tiffs, and in my opinion, there was abundant evidence in the record to justify the finding. The vessel was old, having been built in the year 1882. She was acquired by the defendant in 1913. Prior to that time she was commissioned as a merchant vessel, although for a year previous she had lain inactive in the harbor of San Francisco. After the defendant acquired her, she was not used in the merchant service, but was used solely for carrying supplies and fishermen to the different canneries operated by the defendant, making but a single trip each year. In 1917, while being sailed to a cannery, she sprang a leak in the first gale encountered, and was brought back, temporarily repaired, and taken to the cannery in tow. In 1918, she encountered ice on her trip, and the evidence of the carpenter is that on this occasion she received severe strains. On the trip here concerned she also sprang a leak at the first gale encountered. This leak was, to my mind, much more serious than the majority seem to consider it. Water poured into the hold of the vessel in sufficient quantities to cause it to rise therein at the rate of ten inches an hour. The vessel was over three hundred feet in length, with a beam of thirty-eight feet, and it requires no very intricate mathematical calculation to show that the quantity was considerable. It was sufficient at any rate to thoroughly frighten the crew. Many of these were men who, in their earlier years, had followed the sea, and men who would know a dangerous leak in a vessel as well as would any other person. No ordinary leak would cause them concern, and the fact that they were alarmed is in itself evidence that the leak was unusual and dangerous.

I think, too, that the evidence fairly shows that the leak was sufficiently alarming to cause the master of the vessel concern, despite his subsequent contrary assertions. In his radiograms sent to the owners at

the time, he mentioned not only the fact that the vessel was leaking, but the rate per hour of the leak, and asked for instructions. Manifestly, if he had regarded it as nothing but the usual and expected, it would not have occurred to him to mention the fact. It is true that the pumps took care of the water during the remainder of the voyage, but to do this they were kept in operation continuously. Moreover, the journey was made in fair weather. What would have happened had another gale been encountered can only be conjectured. I am aware that it is said in the majority opinion, as an argument that the leak was not dangerous, that "the power pumps were always adequate to take care of the water and it was never necessary to use the hand pumps." But I can find nothing in the evidence that indicates that the vessel had hand pumps, except as these pumps might be so called. The captain's testimony concerning the pumps was that the vessel had no pumps other than the power pumps, but that these were so arranged that they could be used as hand pumps, if the power failed.

I cannot but feel, also, that the majority have minimized the condition the vessel was found to be in after she had reached her destination and was unloaded. The carpenter testifies that he found two open butts on the port side of the vessel, and an open seam and an open butt on the starboard side. These he remedied by recaulking. But he testifies that the most troublesome condition of the vessel arose from an injury to the parts surrounding the rudder post. His description of the affected parts is given in terms too nautical to convey to my mind any very definite idea as to what the parts were, but it can be gathered from his testimony that on some such part the fastenings had given way leaving the rudder post loose; that the loosened parts would open as strain was put upon the rudder,

letting water enter into the hold of the vessel. These defects he could remedy only partially. The loosed parts of the vessel he could not refasten; the best he could do was to fill the openings with oakum and hold it in place by tacking over it sheet lead, which would only partially stop the leak.

When the vessel returned to Seattle, even Lloyds surveyor became alarmed at her condition and insisted that she be overhauled. In this work it was found that some of the heavy timbers forming the keelson had become so far decayed that an ordinary chisel could be driven by hand through pieces 14 by 14 inches in size. In making the repairs it was found necessary to remove these decayed pieces and install new timbers in their place and to further strengthen the keelson by fastening thereto additional heavy timbers running for the full length of the vessel. The vessel was further strengthened by the insertion of two new deck beams with knees, and by the insertion of "two big iron rods", with turn buckles, running from stem to stern directly beneath the main deck.

What was learned as to the condition of the vessel when she was overhauled could not, of course, be known to the men at the time they refused to return on the vessel. The boat's behavior, however, was such as to indicate with unerring certainty its real defect. It was shown that the rigging of the vessel stood staunch and tight before loading and immediately thereafter became slack. This was explained to mean that the load had caused the keel to bend downward at the middle of the vessel which resulted in the cupping of the top of the vessel, and thus a shortening of the distance between the fastenings of the stay lines of the rigging. The converse of the proposition would also be true. A bending in the other direction, which could well happen when the vessel was riding a storm,

would cause the vessel to spread at the top, which would account for the parting of the butts and the opening of the seams on the planking of the vessel's sides.  Clearly, these conditions rendered the boat unsafe for these turbulent northern seas, where gales and storms are the rule rather than the exception at the season of the year the boat was required to return. · But it is said the boat returned in safety.  So it did.  But it was loaded with cargo only to its sixteen foot draft line.  Had it carried these three hundred and more men in addition to its cargo it would have been subjected to different tests.  It came down in tow, and it is noticeable that the course of the tow followed the coast line on its journey, although a direct course would have been several hundred miles shorter.  The vessel also gave evidence of its inherent weakness on its return journey, even with its light load.  At one point it encountered the "tail end" of a storm, and immediately began to leak, taking some eight inches of water in twenty-four hours' time.

I can but feel, also, that the majority have unduly censured the conduct of the men.  In spite of the seeming inference to the contrary in the majority opinion, there was no unseemly behavior among them at any time.  The captain of the boat is witness to this, and both the agent of the defendant and the chief officer of the revenue cutter testify that there was no disorder while the men were on shore at the cannery.  Stress is laid on the fact that the men held a meeting immediately after landing at the cannery and announced that they would not return on the vessel before the cause of the leak was discovered.  But the men then knew the history of the vessel, knew that it developed a weakness whenever it encountered a storm, and the fact that they gave the notice thus early is to my mind evidence of good conduct and good faith on their part rather

than an indication of concert and design to injure the defendant wilfully; it gave the defendant notice in ample time to meet the emergency. The defendant, it is true, gave no heed to the notice, possibly under the belief that the exigency of the situation at the close of the fishing season would cause the men to return in the vessel despite their belief of its unseaworthiness. And it was because it gave no heed to the notice that it was later obliged to call to its aid the revenue cutter. But even the officer of that vessel, as I have said, testifies to the good behavior of the men, and testifies, though perhaps unwittingly, to facts which show their good faith. After he had completed his so-called survey and had determined to his own satisfaction that the vessel was seaworthy, he called on the men to sail her home in accordance with their agreement. They refused.    He then caused certain sections of the United States Revised Statutes to be read to them, and informed them that they were in danger of losing their earnings if they did not obey. They answered that danger of loss of earnings was nothing when compared to danger of loss of life. He then informed them that it was within his power to arrest them as vagrants and to cause their conviction as such in the Alaska courts. They answered that breaking rocks on Alaska roads was preferable to a watery grave. It is in evidence also that certain of the men, believing that there was no other alternative than a return on the vessel, traveled on foot for many miles on that barren coast to a point where they could take passage home on another vessel.

It seems to me that there was here sufficient evidence to warrant even the court in finding that the vessel was in fact unseaworthy, that the men acted in good faith and within their just rights in refusing to return on the vessel, and that they were in no sense deserters. But if I am wrong in this conclusion, I think the judg-

ment directed by the majority erroneous for another reason. If it be a fact that the vessel was seaworthy, and the men were wrong in their belief that it was not, they should be held to be constructive rather than wilful deserters, and under such a holding no principle of law or justice requires that their entire earnings be forfeited. At most they should be held to make good only the actual and necessary loss their mistake caused the defendant.

The defendant's actual outlay in towing the vessel on its return voyage and transporting the men home, as set forth in its answer, is less than $17,500. It alleged in its answer that its total damage was $66,204.41. This was made up in part by charging the men for the extra wages paid and the extra supplies furnished to the China crew and the shore men for the time of the delay caused in completing the arrangements for their transportation after the close of the fishing season. But the defendant was given notice that the men would not return on the vessel immediately on its arrival at the cannery before the commencement of the fishing season, and in ample time to enable the defendant to make other arrangements for their return transportation at the close of that season. It did not heed the notice, and made the arrangements only after it failed to coerce the men to return on the vessel after such close. The delay was thus the result of the defendant's own fault and neglect, and I know of no principle of law which will permit a person to enhance his damages by his own fault and neglect. The balance of the item is made up by charging the men five dollars for each day the crew was detained while arrangements were being made for returning them home. As I read the contract the clause therein supposed to authorize this charge applies only to a refusal to work on the fishing grounds at the work of

fishing, not for any refusal to sail the vessel. But if it can be said that the refusal to sail the vessel was a refusal to work within the meaning of the contract, the delay for which the charge is made was not, as I have shown, the fault of the men. Not being so, they should not be charged with it, and the utmost sum that should be deducted from the wages earned is the actual and necessary expenditure caused by the men, namely, the actual cost paid in towing the vessel, plus the actual cost paid as transportation for the crew.

There are trial errors urged by the appellant which I have not noticed and which might possibly require a new trial, but upon the grounds discussed in the majority opinion, I can find no sufficient reason for a reversal.