[No. 15407. Department One. September 14, 1920.]

# OLE SANDANGER, *Respondent*, v. CARLISLE PACKING COMPANY, *Appellant*.[1]

MASTER AND SERVANT (31,155)—INJURY TO SERVANT—NEGLIGENCE—FURNISHING UNSAFE APPLIANCES. The furnishing of gasoline in a kerosene can which was customarily used for kerosene to start a fire in the galley stove of a motor boat, is negligence rendering the owner liable for injuries sustained by a member of the crew through an explosion resulting from its attempted use under circumstances from which he might assume that the contents was kerosene.

MASTER AND SERVANT (147)—INJURY TO SERVANT—CAUSE OF ACCIDENT—EVIDENCE—SUFFICIENCY. Upon an issue as to whether defendant negligently filled a kerosene can with gasoline, as part of the equipment of a motor boat, resulting in an explosion, injuring a servant who attempted to start a fire with it, a finding for plaintiff is sustained where there was evidence that the can was filled from appellant's stores on shore shortly before starting on the trip; that the explosion was of great violence and clearly showed that the use of a small quantity of gasoline would generate fumes sufficient to cause such an explosion, while a similar use of kerosene would not do so, there being no suggestion that the contents of the can was other than kerosene or gasoline.

SEAMEN (3)—INJURY TO SEAMEN—COURTS—CONCURRENT JURISDICTION. The rights of a seaman as to injuries resulting from unseaworthiness of the ship are the same under the rules of the common and the maritime law.

ADMIRALTY (3, 4)—MARITIME TORTS—INJURY TO SEAMAN—JURISDICTION OF COURTS—COMMON LAW REMEDY. A member of the crew of a motor boat injured by an explosion of gasoline negligently furnished in a kerosene can as part of the equipment of the boat, when attempting to use the contents of the can in the customary manner in starting a fire in the cook stove, may sue in the state courts for damages sustained from such injuries, and is not limited under the maritime law to a recovery of necessary expenses in his maintenance and cure, though his employment and service was maritime in its nature; since the recovery will be sustained on the theory that the injuries were received in consequence of the unseaworthiness of the ship.

[1]Reported in 192 Pac. 1005.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered February 3, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a seaman through an explosion of gasoline. Affirmed.

*Hadley & Hadley* and *Kerr & McCord,* for appellant.

*Fred H. Lysons,* for respondent.

PARKER, J.—The plaintiff, Sandanger, commenced this action in the superior court for King county, seeking recovery from the defendant packing company for personal injuries alleged to have been the result of the negligence of the defendant in furnishing as a part of the equipment of one of its motor boats, upon which he was employed, gasoline in a one-gallon kerosene oil can, under such circumstances as to induce him to innocently use it as kerosene; resulting in a flareup or explosion, causing him to be seriously burned. Trial in the superior court sitting with a jury resulted in a verdict in favor of the plaintiff and a judgment rendered thereon in the sum of $4,175, from which the defendant has appealed to this court.

Respondent, Sandanger, is a resident of this state. Appellant packing company is a corporation created and existing under the laws of this state, with its general offices in Seattle. It owns and operates a salmon cannery near Cordova, Alaska, in connection with which it owns and operates several motor boats. On and prior to March 7, 1917, respondent was employed by appellant to work in and about its cannery, and also upon its motor boats as he might be directed. On that day he was assigned to duty upon one of appellant's motor boats as one of the crew consisting of himself

and three others, one Stensland being in command
The boat was twenty-eight feet long, with an enclosed
cabin forward, in which there was a motor near the
middle, and a bunk and bench along one side, and a
bench along the other side, on which sat a small sheet
iron wood-burning stove used for cooking meals for
the crew. Under the bench, on which the stove sat, but
further forward, and evidently in a safe place, there
sat the one-gallon kerosene oil can here in controversy.
This can, with kerosene in it, had been furnished as a
part of the boat's equipment, for the purpose of filling
the lamps of the boat. According to conceded custom,
kerosene was taken from the can and used to start
fires in the small cook stove; that is, by first pouring
a small quantity of kerosene on the wood and then
applying a lighted match to the fuel so prepared. We
here note in passing that there is no suggestion in the
argument of counsel that such use of the kerosene con-
stituted carelessness on the part of one so using it.

Respondent had worked upon this boat as a member
of its crew on several former occasions and was well
acquainted with its arrangement and equipment, in-
cluding the kerosene oil can, and also the custom of
using kerosene from the can to start fires in the stove.
About seven o'clock in the morning of the day in ques-
tion, the boat left the cannery to go some twenty miles
southwesterly to a place where suitable sand could be
procured for some contemplated masonry work, with
a view to bringing back a load of the sand in sacks.
The boat arrived at its destination about an hour or
so before noon. The boat was provisioned for the noon
meal of the crew, in view of the fact that the trip would
take all day. One of the crew started a fire in the cook
stove for the purpose of preparing the noon meal, us-
ing, instead of kerosene, a bunch of waste which had

become saturated with oil from use in wiping the engine. The meal being prepared, and evidently the work of loading the sand being finished, the food was brought out on deck, where it was served and eaten. It seems that the boat at that time had started on its homeward journey, and the work of the day, other than washing the dishes, being finished, the crew were at ease and privileged to rest and enjoy themselves.

About an hour and a half or two hours after serving the meal, when the fire in the cook stove was allowed to go out, and after it actually had gone out and the stove and ashes therein had become cold, according to positive testimony which the jury had a right to believe, respondent was directed by Stensland to start a fire in the stove and heat water to wash the dishes. He went into the cabin, placed some wood in the stove, took the kerosene oil can from its accustomed place, poured a small quantity of whatever was in the can on the wood, then holding the can in one hand away from the stove, lighted a match and dropped it upon the wood in the stove, when instantly there was a flareup of great violence, amounting practically to an explosion, which was of such force as to cause some damage apart from the mere burning that immediately followed. Respondent was thrown across the cabin, but soon recovered himself and rushed upon deck with his clothes on fire. His associates being unable to put out the fire on his clothes, he jumped overboard, when a plank was thrown to him and he was taken on board. The fire in the cabin was extinguished and the boat proceeded to Cordova as fast as possible, arriving there late in the afternoon, when respondent was given medical treatment. Respondent's counsel prosecuted the case, and was awarded recovery, upon the theory that appellant had negligently furnished gaso-

line in the kerosene oil can instead of kerosene, and that such act was negligence on the part of appellant rendering it liable to respondent for the injuries received in the manner we have described.

It is first contended in appellant's behalf that the trial court erred in overruling its challenge to the sufficiency of the evidence to support recovery on the ground of its negligence, presented by proper motions timely made. Practically the whole of the argument of counsel touching this contention, apart from the Federal maritime question to be presently noticed, has to do with the question of whether the kerosene oil can contained gasoline or kerosene at the time respondent used whatever was in the can to start the fire in the stove. If it was kerosene, appellant would not be responsible for respondent's injuries; while if it was gasoline, it seems plain that, because of the liability of gasoline to generate explosive gas when so used, appellant would be responsible for respondent's injuries; or, rather, a jury could well find from the evidence that the furnishing of gasoline under such circumstances was negligent and the proximate cause of respondent being injured. There was testimony fully warranting the jury in believing that, when the boat returned to the cannery from its previous day's trip, there was no kerosene or other fluid in the can, it being all used that day in filling the boat's lamps, and there being none left even for the starting of a fire in the cook stove on that day; that whatever was in the can at the time respondent was injured was put into it from appellant's store of supplies on shore between the time the boat returned the day before and the starting of the boat on its trip that day, and that no one attempted to use whatever was in the can to start a fire in the cook stove that day until respondent did so.

The evidence does not disclose with certainty who filled the can or where it was filled, but there is some ground for inferring that it was filled by Stensland, the commander of the boat, from appellant's store of supplies on shore. It, in any event, seems to have been his duty to see that the can was filled. There is some evidence tending to show that appellant did not exercise due care in keeping its gasoline and kerosene receptacles in its store of supplies on shore properly designated so that their respective contents would be readily distinguishable. This evidence is not very satisfactory, but is of some moment in view of what actually happened. The testimony of chemists and men of experience, with reference to the comparative burning and explosive qualities of kerosene and gasoline, furnished the jury abundant ground for believing that the use of kerosene in a cold stove in the manner respondent used whatever was in the can when he attempted to start the fire would not cause any such an explosion as then occurred; while the use of gasoline in a cold stove in such manner would cause such an explosion. That is, by the pouring of a small quantity of kerosene on the wood, explosive fumes would not be generated sufficient to cause an explosion by the applying of a lighted match thereto; while such use of a small quantity of gasoline would generate fumes sufficient to cause such an explosion. There is no suggestion in the argument of counsel, indeed we think there is no ground therefor, that the contents of the can was other than kerosene or gasoline; so it becomes a question of the evidence showing with a fair degree of probability that it was gasoline instead of kerosene; that is, as to whether the evidence was such as to take the answer to that question out of the realm of speculation and conjecture.

Counsel for appellant rely upon our decisions which are reviewed by Judge Chadwick in *Parmelee v. Chicago, M. & St. P. R. Co.*, 92 Wash. 185, 158 Pac. 977, holding, in substance, that the evidence must be such as to prove a fact necessary to recovery by a degree of certainty that removes the inquiry from the realm of speculation and conjecture. We have no disposition to recede from the holdings in those decisions. We are of the opinion, however, that the evidence introduced upon the trial of this case was such as to render these decisions without controlling force upon our present inquiry. Were we trying the question of fact which the jury were called upon to determine, we might not arrive at the same conclusion, but that is not sufficient to warrant us in ignoring the verdict. We are not the triers of the facts, but are permitted here to inquire only as to whether or not there was substantial evidence to support the conclusion the jury arrived at; that is, as to whether or not the evidence leaves the answer to the question as one of speculation and conjecture. We hardly think it possible to state in general terms a rule which would furnish any exact measure for the decision of questions like this. Probably the language of Judge Chadwick in *Frescoln v. Puget Sound T., L. & P. Co.*, 90 Wash. 59, 155 Pac. 395, comes as near as is possible of doing so, wherein he said:

"Speculation and conjecture, when used in this connection, mean the same thing. The cause of an accident may be said to be speculative when, from a consideration of all the facts, it is as likely that it happened from one cause as another. As soon as the balance of possibilities is broken, the jury is put to the burden of weighing the evidence."

We think the jury was put to such burden in this case, and conclude that the trial court did not err in refusing to sustain the challenge made to the evidence

in appellant's behalf, viewing this branch of the inquiry, as we have, apart from the Federal maritime question, which we will now proceed to notice.

Counsel for appellant contend that respondent's recovery, as to its measure, is controlled exclusively by the maritime law as administered in the Federal courts in admiralty cases, and that he possesses no rights whatever under substantive common law, because his employment and service on the day he was injured was purely of a maritime nature; and, while admitting that respondent may seek recovery from appellant in the common law courts of the state, that his recovery is limited under the maritime law by the amount of necessary expenses he may incur in his cure, and maintenance while being cured, which is conceded to be $175, in addition to the service of that nature already rendered him by appellant.

It does seem that respondent's employment and service on the day in question was maritime in its nature. We shall so assume in our disposition of the case, without further discussion of that question. *The Minna,* 11 Fed. 759; *Saylor v. Taylor,* 77 Fed. 476; *Lawrence v. Flatboat,* 84 Fed. 200; *Domenico v. Alaska Packers' Ass'n,* 112 Fed. 554; *The J. S. Warden,* 175 Fed. 314; *The Virginia Belle,* 204 Fed. 692; *North Alaska Salmon Co. v. Larsen,* 220 Fed. 93.

Counsel for appellant invoke the Federal statute defining the admiralty jurisdiction of the Federal district courts, reading as follows:

"Sec. 24. The district courts shall have original jurisdiction as follows: . . .

"Third. Of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it; . . ." 36 U. S. Stat. at L., 1091.

Proceeding upon the theory that this statute saves to suitors merely the right to sue in the common law courts and avail themselves of the procedure of those courts, and does not enable such suitors to avail themselves in those courts, any more than in the Federal admiralty courts, of the rules of substantive common law as controlling of their rights, counsel for appellant invoke the principles of maritime law as announced by Mr. Justice Brown, speaking for the supreme court of the United States in *The Osceola,* 189 U. S. 158, after reviewing the subject at length in the light of its historical development, as follows:

"Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following propositions:

"1.   That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

"2.   That the vessel and her owners are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship.

"3.   That all the members of the crew, except perhaps the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

"4.   That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident."

If our decision in *Larson v. Alaska Steamship Co.*, 96 Wash. 665, 165 Pac. 880, L. R. A. 1917 F 671, is to remain as a correct exposition of the law touching our present inquiry, that decision seems to us to be here decisive in favor of appellant. The employment and service of the plaintiff involved in that case was concededly maritime in its nature. He was injured while the ship was anchored off shore in Alaska waters, when at work preparatory to working cargo, by falling through a hatch of the ship upon his taking hold of an insecurely fastened chair pedestal to steady himself as he was about to descend through the hatch, which, giving way, caused him to fall and suffer the injuries for which he was awarded recovery. Contention was there made against the plaintiff's right of recovery upon the same theory in substance as the contention is here made in behalf of the appellant; but it was then thought by the members of this court participating in that case that the decision of the Federal supreme court in *The Hamilton*, 207 U. S. 398, and other prior Federal decisions, called for the conclusion that a substantive common law right could be invoked by the plaintiff apart from the maritime law; but the language of the decision also seems to clearly indicate that the plaintiff's right of recovery could be rested upon the exception to the limitations put upon seamen's recovery by the maritime law, mentioned in the second of the maritime law propositions above quoted from the *Osceola* decision; that is, that the vessel and her owner are "liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship," and, as to such injuries, are not limited to expenses incurred for maintenance and cure. Concluding his discussion of the legal basis of the plaintiff's

right of recovery in that case, Judge Chadwick, speaking for the court, at page 675, said:

"Our conclusion is that an action *in personam* may be maintained for a tort committed on the high seas if the accident is attributable to the 'unseaworthiness' of the vessel; that the common law courts of a state have jurisdiction concurrent with the Federal courts when proceeding *in personam,* and that the state court will grant the relief that a common law court would have granted had the case been originally triable in such court."

This, it seems to us, is but a recognition, and correctly so, that, as to injuries resulting in consequence of unseaworthiness, the rules of common and maritime law governing such a suitor's rights are the same. Now, if the insecurely fastened chair pedestal, the giving way of which caused the plaintiff Larson to be injured, was "in consequence of the unseaworthiness of the ship," as we think was correctly held in that case, so as to enable him to recover under the maritime law, which in effect adopts the rule of the common law as to injuries so occasioned, it seems to us equally plain that the negligent furnishing of gasoline as kerosene under the circumstances inducing its dangerous use, as was done in this case, rendered this boat unseaworthy in the same sense that the ship was rendered unseaworthy in the *Larson* case. It seems hardly possible to state in general terms a definition of "unseaworthiness," as used in the maritime law in this connection, which will furnish an exact standard in all cases in determining just what defects in structure or equipment should be considered as rendering a vessel unseaworthy. In Carver on Carriage of Goods By Sea (6th ed.), § 18, it is said: "The ship must be fit in design, structure, condition and equipment to encounter the ordinary perils of the voyage. (*a*) She must also

have a competent master and a competent and sufficient crew.'' This was said having in view the general question of liability of carriers to the shippers; but we apprehend that the law calls for an equal degree of safety as to ''design, structure, condition and equipment,'' looking to the safety of seamen. It seems to us that the negligent furnishing of the gasoline in the place of kerosene, under such circumstances as was done in this case, was fraught with even greater perils than the furnishing of the insecure chair pedestal, as was done in the *Larson* case. The former menaced the safety and even the lives of the entire crew, and the existence of the boat itself; while the latter was a menace only to the individual that might seek to use it in some such manner as Larson did. The following authorities, we think, lend support to our conclusion that the maritime law does not stand in the way of respondent's recovery in this case. *The Titana,* 19 Fed. 101; *The Noddleburn,* 28 Fed. 855; *The Troop,* 128 Fed. 856; *The M. E. Luckenbach,* 174 Fed. 265; *The Argo,* 210 Fed. 872; *The Badger,* 218 Fed. 81.

Counsel for appellant call to our attention, and strongly rely upon, the decision of the supreme court of the United States in *Chelentis v. Luckenbach Steamship Co.,* 247 U. S. 372. That decision, it is argued, establishes the law as different from our conclusions reached in the *Larson* case, and also different from what was theretofore generally thought to be the law as gathered from expressions of the courts found in previous Federal and state decisions. A seaman was washed overboard and his leg broken, as it was claimed, as a result of a negligent and improvident order given by a superior officer. It was held that he could not recover as for injuries received ''in consequence of the unseaworthiness of the ship,'' and therefore could not

recover damages at all as for negligence. Plainly that was not a case of unseaworthiness of the ship. We think that decision does not express any view of the law contrary to our conclusion reached in the *Larson* case, other than contrary to our seeming conclusion there reached that Larson's recovery could be rested upon the common law apart from the maritime law.

We conclude that respondent's recovery in this case may be sustained upon the theory that his injuries were received in consequence of the "unseaworthiness" of the boat upon which he was working.

A number of assignments of error are made by counsel for appellant touching the court's giving instructions and its refusal to give certain requested instructions. What is said in the briefs touching these claims of error is practically nothing more than assertions of error, they being presented to us practically without argument. We do not feel called upon to dispose of them other than in an equally summary manner, and deem it sufficient to say that, as is disclosed by the record and brief of counsel before us, we are unable to say that the court committed any prejudicial error in the giving or refusing to give instructions.

The judgment is affirmed.

HOLCOMB, C. J., MAIN, MITCHELL, and TOLMAN, JJ., concur.