[No. 26357. *En Banc.* August 5, 1938.]

S. A. STEEN et al., *Appellants,* v. THE POLYCLINIC et al., *Respondents.*[1]

*A. E. Jonson* and *John F. Dore,* for appellants.

*J. Speed Smith, Henry Elliott, Jr.,* and *Eggerman & Rosling,* for respondents.

[1]Reported in 81 P. (2d) 846.

ROBINSON, J.—On August 28, 1930, H. J. Davidson, hereinafter referred to as defendant or respondent, removed the tonsils of Sylvia Daniels, who was then thirteen years of age. On August 25, 1933, almost three years thereafter, this action was brought by her parents and guardian *ad litem* to recover ten thousand dollars, on grounds of negligence alleged as follows:

"That the said negligence and carelessness and unskilled conduct on the part of the said defendants in the performance of said medical services consisted in cutting or causing to be cut and/or infected the vocal cords and nerves that control the vocal cords, or the organs and nerves that control the voice, in such a manner as to cause the loss of the voice; and in the performance of said operation at a time when said child had an infection in her throat commonly known as a 'cold,' and which was known to said defendants at the time of the performance of said operation; and performing said operation and treating the said child's tonsils in such an unskilled and careless manner as to permanently cause the loss of the said child's voice."

The case did not come on for trial until January 7, 1935, more than four years after the operation. The jury returned a verdict for ten thousand dollars; and motion for judgment notwithstanding the verdict and, in the alternative, for a new trial was promptly made, but did not come on for hearing until March, 1936. A judgment was entered for the defendants notwithstanding the verdict on June 12, 1936; the court, also, in accordance with the rule in such cases, passing upon the motion for a new trial. This appeal was taken on July 2, 1936, but, for some reason, was not argued in this court until September 27, 1937. A reargument *En Banc* was thereafter ordered, which, due to the protracted and ultimately fatal illness of appellants'

chief counsel, did not take place until May 2nd of this year.

■ In asking this court to set aside the judgment appealed from and direct the entry of a judgment on the verdict, appellants correctly contend that the trial court was not warranted in entering judgment notwithstanding the verdict unless it can be said that there was neither evidence nor reasonable inference from evidence to sustain it. Where the evidence is conflicting upon an issuable fact, and where minds of reasonable men may differ with respect thereto, the question is one for the jury to determine, and, in passing upon a motion for judgment notwithstanding a verdict, all evidence favorable to the party who received the verdict must be taken as true, and all reasonable inferences therefrom which are favorable to him must be drawn. These rules and principles are so firmly established that, as is said in the brief filed on behalf of the appellants, no citation of authority is necessary. The appellants' contention, therefore, calls for a minute and painstaking examination of the statement of facts and the exhibits made a part thereof.

One of the allegations of negligence, that is, that the operation was performed at a time when Miss Daniels had a cold, resulting in infection causing loss of voice, was disposed of by the first witness, her mother, who testified that Dr. Davidson refused to operate for that reason and did not operate until Sylvia had recovered. The allegation that the defendant cut the vocal cords or the nerve that controls the vocal cords was subsequently amended, as to the manner of severance, by the introduction of evidence during the trial.

Although Dr. Davidson testified that, when Miss Daniels came to him for the operation, her voice was "husky," and his office records characterized it on October 1, 1930, a month after the operation, as "voice

husky;" on October 10, "hoarse, keeps clearing her throat;" December 6, 1930, "voice improving;" and January 21, 1931, "voice improving, still slightly husky;" and he testified that she did not have a whispering, but only a husky, voice on July 25, 1931, and two of his office assistants testified that, when she came for the operation, her voice was merely husky, as if due to a cold, Miss Daniels herself, her mother, her step-father, and no less than six neighbors and friends of the family testified that, previous to the operation, Miss Daniels had a beautiful, fine, normal, singing voice, and after the operation she was never known to sing or speak above a whisper. The jury was therefore warranted in finding for the plaintiff on that issue.

As tending to prove that the operation was performed in a rough manner, evidence was introduced to the effect that Miss Daniels had a hemorrhage two or three days after the operation, and that the blood "spurted" from her mouth like "water from a hose;" that she had another hemorrhage several days later, and a third on the eleventh day after the operation, so violent as to "soak three big bath towels" with blood and "the whole bed more or less;" and although Dr. Hartung, who was called in to stop the first hemorrhage and who testified for the plaintiff, said that it was no more than what one might call an "oozing," which he easily stopped, and that it was a "nice, clean tonsillectomy," and Dr. Davidson testified, as to the third occasion, that Miss Daniels' pulse was normal, she had no fever, and that she merely spit out saliva mixed with blood, it was the duty of the trial court, in passing upon the motion for judgment notwithstanding the verdict, to resolve all conflicts in evidence in favor of the plaintiff.

Dr. Thomas Ratigan was called on behalf of the plaintiffs. Although a general practitioner, he had removed

as many "as thirty pairs of tonsils in a morning." He testified that one hemorrhage after a tonsil operation was usual, but that three occurring in a period of seven or eight days after an operation were so unusual as to indicate that there had been a rough pulling or stretching.

Dr. Davidson testified that hemorrhages from seven to ten days after the operation were of occasional occurrence where the tonsils were very large, as in this case; and Dr. Brugman, an eye, ear, nose, and throat specialist, testified that hemorrhages occurring as late as the tenth or eleventh day were no reflection on the surgeon at all.

Early in the trial, the plaintiffs, in anticipation of an affirmative defense that Miss Daniels' whispering voice was due to a growth on the vocal cords, introduced the evidence of Dr. Ratigan to the effect that he had examined Miss Daniels' throat on the previous Saturday and found no growth on her vocal cords. During the interval between the operation and the trial, Miss Daniels had consulted, or been treated by, no less than twelve surgeons and laryngologists in Seattle and vicinity. Miss Daniels was asked on cross-examination:

"Q. Did any of those doctors tell you what was wrong with your voice? A. No. They said that there was a growth. Q. They said there was a growth on the vocal cords? A. Yes, sir."

Later, she said that Dr. Winslow did not express an opinion, and that Dr. Chase did not.

Dr. Purman Dorman, an eye, ear, nose, and throat specialist on the staff of the county hospital, the Swedish hospital, the Columbus hospital, the Virginia Mason hospital, and the Maynard hospital, was called for the defense and, after explaining at length the anatomy of the larynx, the appearance and the func-

tions of the vocal cords, and the course of the recurrent laryngeal nerve which controls their motion, was asked if he had made a laryngoscopic examination of the plaintiff's throat, and replied that he had on January 11, 1931; whereupon plaintiff's counsel objected to his testifying on the statutory ground that the matter was privileged. The objection to his further testimony was sustained.

Dr. Francis Brugman, a specialist in eye, ear, nose, and throat of twenty-four years' standing, was called by the defense, and, having covered at length the same general matters as Dr. Dorman, was asked whether he had ever made a laryngoscopic examination of Miss Daniels' throat. He replied that he had on August 21, 1931, and again in November of the same year. He was asked what the examination disclosed, and, again, plaintiff's attorney successfully interposed the bar of the statute.

Dr. Julius Weber, an eye, ear, nose, and throat specialist of ten years' experience and a member of the Orthopedic, Providence, and county hospital staffs, was called and testified at length concerning the anatomy of the throat and kindred matters. When he was asked whether he had made a laryngoscopic examination of Miss Daniels' throat and replied that he had about two months before the trial, plaintiffs' counsel again interposed the statute.

The court, upon motion of the defense, then appointed two eye, ear, nose, and throat specialists of his own selection, to examine plaintiff's throat, adjourning the trial for that purpose: Dr. A. T. Wanamaker, who graduated from Northwestern Medical School in 1907 and later studied in London and Vienna and has specialized in eye, ear, nose, and throat in Seattle since 1910; and Dr. B. E. Washburn, who gradu-

ated from Chicago University in 1913 and took post-graduate work in New York, Chicago, Vienna, and London. The gist of Dr. Wanamaker's report is contained in the following quotation from his testimony:

"I used a throat mirror and a head mirror, and then I had her breathe. I took hold of her tongue, and she cooperated with me very nicely. Immediately I noticed that the cords were white, and that they moved both when she breathed and when she tried to phonate, and located on the right vocal cord is a small growth about midway between the anterior and posterior end, and about two-thirds of the way up on the left cord is another growth. On the anterior commissure—that is the point where the two cords come together—is another fleshy protuberance, or a growth, which keeps the cords from coming in close proximity."

Dr. Washburn testified that he independently found the same growths, and both testified that they were the cause of Miss Daniels' whispering voice, because they prevented the cords from coming together. While it seems incredible that any two men in the position of these disinterested specialists could be so reckless as to testify that growth and protuberances were plainly visible on the cords if there were none, since the subject matter of their evidence was such as to make their guilt of wilful and deliberate perjury in so doing susceptible of simple, easy, and immediate proof, it must be remembered that the trial court had no right to weigh the evidence. The jury, whose right it was to do so, evidently believed Dr. Ratigan, and, in passing upon the matter as now presented to us, we must proceed upon the theory that the defendant failed to establish his affirmative defense. This does not determine the matter however, for the defendant also pleaded a general denial.

The second allegation of negligence was that Dr. Davidson cut the cords or the nerve. On this point,

all eight surgeons who testified in the case, with the exception of Dr. Hartung, declared that it was impossible to cut the cords or the nerve in a tonsil operation for a number of reasons, and particularly because a tonsil snare could not possibly be gotten past the epiglottis and into the voice box. Dr. Hartung said the nerve could not be cut unless the patient was anatomically abnormal. There is no claim that Miss Daniels was. Dr. Ratigan, the appellant's other expert, testified, as follows:

"Q. The snare which you identified is not such an instrument that the operator could cut the cords themselves with, is it? A. You mean the vocal cords? Q. Yes. A. No, sir. Q. By reason of the kind of instrument and because of the location of the cords as well? A. Right. Q. Isn't that likewise true with reference to the recurrent laryngeal nerve? A. *He could not have cut it.* Q. Because of its location? A. Because of its location. Q. And likewise because of the nature of the instrument used? A. Yes." (Italics ours.)

Dr. Ratigan, however, said that, in his opinion, Miss Daniels had a whispering voice because Dr. Davidson had pulled so hard on the tonsil "as to separate the nerve from the muscles which control the voice," and that the separation so caused was complete, had continued ever since the operation, and would remain permanent. And so, while the issue as to whether the whispering voice was caused by a severance of the nerve remained paramount, the issue as to the manner of severance was by this evidence shifted from cutting to pulling.

An issue immediately arose as to whether such a separation could possibly be caused in that way. Dr. Ratigan testified that he had never seen a tonsillectomy result in a permanent whispering voice, nor had he seen an instance recorded in the books, but he had heard of one. Dr. Davidson testified that he had never

heard of a tonsil operation causing a permanent loss of voice, nor seen any report of such a case in the medical books, and that it is impossible to rupture the recurrent laryngeal nerve by pulling on a tonsil. Dr. Dorman, testifying as to that issue, said in part:

"Q. Is it possible in the removal of the tonsils by pulling upon the tonsils to exert a force sufficient to completely separate the recurrent laryngeal nerve from the muscles to which it is attached? A. No, it is not possible. Q. Why isn't it possible? A. It is not possible to separate the recurrent laryngeal nerve, because of its many ramifications, because it is enclosed in muscle tissue, which is very giving. It is not elastic, but it is not rigid; it is a giving tissue, much as this (illustrating), so, if I would pull upon it from above, the nerves would give right along with it."

He also testified that he had never heard of an instance where a permanent loss of voice was caused by a tonsil operation or read of any in any textbook.

Dr. Francis Brugman testified as follows:

"Q. Is it possible in an operation of that sort by pulling on the tonsils to completely sever the recurrent laryngeal nerve from the muscles to which it leads, so that the voice would be lost as a result thereof? A. It is not possible. Q. Why do you say it is not possible? A. Well, really, it is so absurd I can hardly describe why, but the recurrent laryngeal nerve enters the larynx at the lower part. The tonsils are located up in a different region entirely. There is no connection between the musculature of the two parts. A force sufficient to do an injury like that would be such I don't believe it could be applied by means of tonsil instruments. Q. You mean that the tonsil would give first? A. Well, the whole neck would almost give."

On the same point, Dr. Julius Weber testified as follows:

"Q. Is it possible by using a snare to exert a sufficient force upon the tonsils, in pulling them loose, to completely sever the recurrent laryngeal nerve from

the muscles or tissue to which it leads and is attached? A. It would be absolutely impossible.   Q. Why is that? A. The tonsils are attached to muscles in the throat, that is, 'on the base of the tongue, neither of which are attached to the larynx, except in turn by other things just like your leg is attached to your head, because your body and your neck is in between, but it is a long ways away.   With those instruments, it could not possibly be reached, because of the distance.   With those instruments working in that region, they would not reach."

Doctors Wanamaker and Washburn, the specialists appointed by the court, testified to the same effect.

Could the jury find, on the evidence produced in this case, that it is possible to separate the recurrent laryngeal nerve from the muscles by pulling on the tonsils?   The respondent does not contend that the fact that six specialists testified that it is impossible, as against a general practitioner who admits that he never heard of it being done, but believes it is possible, would, of itself, justify us in rejecting the verdict.   But the respondent contends that the thing is so absolutely impossible that the minds of reasonable men cannot differ.   In this connection, he points out that all the witnesses agreed that the vocal cords are immediately behind the protuberance commonly called the Adam's apple, whose location is known to everyone; that all the evidence is to the effect that the nerve is imbedded in the muscles at that point, which muscles themselves are attached to and lie around between those cartilages; that, as testified by one of the surgeons, the structure consisting of cartilage and muscles and the within nerve is not anchored there so as to offer resistance to a pull, but freely moves up and down as anyone may determine by firmly putting the tip of his finger on his Adam's apple and swallowing; that it is also a physical fact, concerning which reasonable minds can-

not differ, that the nerve could not be separated from the muscles without pulling the muscles, and, indeed, the whole voice box, to pieces; and that there is no evidence that any such major injury occurred. These contentions are forceful and persuasive, but we do not find it necessary to either accept or reject them.

■ The vital and decisive issue in the case was not whether the nerve could be separated from the muscles by pulling on the tonsils, but whether it was actually separated in any manner. *There is no evidence whatever in the record that the recurrent laryngeal nerve which controls the vocal cords was actually separated or injured.* On the contrary, there is undisputed evidence that it was functioning on the day of the trial. Dr. Ratigan himself testified that, if the nerve was separated from the muscles, it would leave them paralyzed. We quote from the evidence of Dr. Wanamaker, one of the specialists who was appointed by the court to examine Miss Daniels during the trial:

"Q. You made the statement that the cords moved both upon breathing and upon an attempt to speak. A. To phonate, yes, sir. Q. Does that or does that not indicate the presence of a paralysis of the cords? A. That indicates that the cords are not paralyzed. Q. It is your opinion, then, that the cords are not paralyzed? A. Yes, sir. Q. What does that signify with reference to whether or not the recurrent laryngeal nerve is intact or had been completely severed? A. It signifies that the recurrent laryngeal nerve is functioning properly and could not have been injured."

We quote further from the testimony given by Dr. Washburn, the other specialist appointed by the court:

"Q. State whether or not the vocal cords moved upon respiration? A. They moved both on respiration and phonation. Q. State whether or not that indicates the absence or presence of paralysis? A. That indicates the absence of paralysis to the recurrent laryngeal. Q. What does that indicate with reference to whether

or not the recurrent laryngeal nerve is intact or has been severed?   A. It shows to me that the nerve is intact."

Earlier in the trial and before these specialists had been appointed by the court, Dr. Dorman had testified as follows:

"Q. Is it possible, by looking at the cords, to determine whether there is a paralysis present, or not? A. Yes, easily.   Q. How do you determine that?   A. The method of examination to determine whether a paralysis is present?   Q. Whether a paralysis is present. A. A paralysis is demonstrated by no movement of the cord.   Q. One or the other?   A. One or the other. Q. Or both?   A. Or both."

Dr. Ratigan did not testify, as a result of his examination of Miss Daniels or at all, that the muscles controlling her vocal cords were paralyzed, or that he saw any indication of any kind that the nerve was not functioning.   In fact, he twice testified that the cords appeared normal, although he later qualified this by saying they appeared somewhat contracted, and, finally, and just before quitting the witness stand, he testified as follows:

"Q. Was there anything in your examination of Sylvia Daniels which indicated to you that the tonsils had been pulled at the time of their removal sufficient to tear the laryngeal nerve from the muscles which it feeds?   A. Only one thing.   Q. What is that?   A. That is her loss of voice.   Q. You are unable to explain the loss of voice in any other way?   A. Absolutely unable to explain it."

Suppose it be alleged that an electric light does not function properly and that the cause is that the wire carrying the current to the bulb was, and is, completely severed.   An expert testifies that, in his opinion, the wire must have been severed.   Two other experts examine the light and testify that, whatever its deficien-

cies, the bulb lights up, though imperfectly, whenever the electrical impulse is sent out from the powerhouse. The first expert, who has also carefully examined the light and observed its performance, does not dispute this, but continues to say that, in his opinion, the wire must be severed, and, when pressed for a reason for that opinion, gives none, other than that he cannot account for the light's faulty performance in any other way. Surely, a jury would not be permitted to find that the wire was severed merely because an expert testified that he, personally, could not account for the light's deficient performance in any other way. The evidence is undisputed that the light does burn, though but dimly. If the wire were severed, it manifestly could not burn at all.

Here, it is not disputed that the appellant's vocal cords respond to the nerve impulses. There is not only a complete lack of evidence that the nerve is severed; there is undisputed proof of a fact which shows that it cannot be.

The trial judge, in a memorandum decision granting the respondent's motion for judgment notwithstanding the verdict, briefly analyzed the evidence in the case, and we, having done so independently and somewhat more intensively, arrive at the same conclusions which he reached, and expressed as follows:

"In the instant case there is not a scintilla of evidence that the nerve in question is severed. Dr. Ratigan merely believes it is severed because the plaintiff lost her voice. Such testimony is not sufficient upon which to predicate a recovery."

The judgment appealed from is accordingly affirmed.

STEINERT, C. J., MAIN, BEALS, GERAGHTY, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—The trial court erred in granting judgment in favor of the defendant notwithstanding the verdict for the plaintiffs.

"A motion for judgment notwithstanding the verdict involves no element of discretion, and should not be granted unless it can be said, as a matter of law, that there is neither evidence nor reasonable inference from evidence to sustain the verdict." *Hart v. Hogan,* 173 Wash. 598, 24 P. (2d) 99.

"It is a settled rule that a motion for judgment notwithstanding the verdict calls for the exercise of no discretion on the part of the court, and can only be granted when there is no evidence and no reasonable inference from evidence to go to the jury. *Hopkins v. Lotus Cafe, Inc.,* 161 Wash. 493, 297 Pac. 178. That rule is applicable in malpractice cases as well as others. *Stickney v. Congdon,* 140 Wash. 670, 250 Pac. 32; *Samuelson v. Taylor,* 160 Wash. 369, 295 Pac. 113; *Sears v. Lydon,* 169 Wash. 92, 13 P. (2d) 475.
"  .      .      .      .      .      .      .      .      .      .

"There are instances where facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skilled in the particular science to show unskilled and negligent treatment. *Cornwell v. Sleicher,* 119 Wash. 573, 205 Pac. 1059.

"It is not necessary that a case of malpractice be proved by direct and positive evidence, and it may be proved by a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. *Helland v. Bridenstine,* 55 Wash. 470, 104 Pac. 626; *Jordan v. Skinner,* 187 Wash. 617, 60 P. (2d) 697. From the facts stated, which the jury had a right to find, there is created a chain of circumstances from which the jury had a right to infer negligence.

"We have not overlooked the rule that, where, upon a given state of facts, physicians and surgeons of equal skill and learning disagree in their opinions as to what the proper treatment should have been, there is no question for the jury. It is enough if the treatment actually employed had the approval of at least a respectable minority of the medical profession and is

recognized by such as a proper method. *Dahl v. Wagner,* 87 Wash. 492, 151 Pac. 1079; *Howatt v. Cartwright,* 128 Wash. 343, 222 Pac. 496. But that rule is not applicable to disputed questions of fact such as appear in this case." *Gross v. Partlow,* 190 Wash. 489, 68 P. (2d) 1034.

See, also, *Brant v. Sweet Clinic,* 167 Wash. 166, 8 P. (2d) 972.

Where a case is tried by jury, our power is exhausted when we find evidence or justifiable inferences from evidence upon which reasonable minds might reach different conclusions. *Skarlatos v. Brice,* 96 Wash. 205, 164 Pac. 939.

We cannot hold, as a matter of law, that defendant is entitled to judgment, where verdict for plaintiff is supported by evidence. *Smith v. Mucklestone,* 157 Wash. 699, 289 Pac. 526.

It is not the province of the supreme court to weigh the probative force and effect of the evidence, and the only matter open for review is the question whether there is substantial evidence to support the verdict. *Champneys v. Irwin,* 106 Wash. 438, 180 Pac. 405.

Where there is evidence to support a verdict, the mere fact that, were we permitted to review it, we might reach a different conclusion, is no reason for disturbing the verdict. *Burden v. Cropp,* 7 Wash. 198, 34 Pac. 834; *Rogers v. Spokane,* 9 Wash. 168, 37 Pac. 300; *Bennett v. Seattle Elec. Co.,* 56 Wash. 407, 105 Pac. 825; *Melius v. Chicago, M. & P. S. R. Co.,* 71 Wash. 64, 127 Pac. 575; *Moynahan v. Interstate Mining, Milling & Development Co.,* 31 Wash. 417, 72 Pac. 81; *Sibley v. Stetson & Post Lumber Co.,* 110 Wash. 204, 188 Pac. 389; *Sandanger v. Carlisle Packing Co.,* 112 Wash. 480, 192 Pac. 1005.

A physician, who attended Sylvia Daniels four days subsequent to the operation, testified that it is possible

to sever the laryngeal nerve in a tonsillectomy; that the loss of the patient's voice contemporaneously with the tonsil operation was caused either by a growth on vocal cords, or by infection, or by severance of the nerve.

The defense to the action was that the growth on the vocal cords was the cause of the loss of the patient's voice. There is no positive evidence that there was any infection. The patient lost her voice when the operation was performed. The surgeon who performed the operation treated his patient continuously for almost a year in an endeavor to restore his patient's voice. He did not discover, until on or about eleven months after the tonsillectomy, any growth on the vocal cords, when he found a spot on the vocal cords. He then sent his patient to another surgeon.

The little girl testified that not until then, which was long subsequent to the operation on her throat, was she advised by a physician that there was a growth on her vocal cords. She further testified that one physician, who attended her four days after the operation to stop an hemorrhage, advised her that the loss of her voice could have been caused by severance of the vocal cord at the time of the tonsil operation.

Another physician testified there was no growth in the girl's throat, and that, in his opinion, the loss of the girl's voice was caused by the cutting or bruising or laceration of the laryngeal nerve. There were medical witnesses called by respondents who testified that, subsequent to the tonsillectomy, they examined the throat of Sylvia Daniels and saw the growth upon which the respondents relied as a defense to this action.

There was competent evidence that it is possible in a tonsil operation to so bruise or sever (pull so hard on the tonsil "as to separate the nerve from the muscles which control the voice") the laryngeal nerve (and

that the operating surgeon did this) as to cause the loss of the patient's voice, but it is inexcusable on the part of the surgeon to sever that nerve.

It was a question of fact whether the loss of voice was caused by a growth on the cords, or by infection, or by cutting or severance of the nerve. Whether the growth was the cause of the loss of the patient's voice, the date—when the operation was performed or nearly a year thereafter—the growth would be of sufficient size to destroy the voice, and whether such growth was a matter of days or months—vital questions—were questions of fact as to which the evidence was in sharp conflict.

The jury found, on competent evidence—the credibility of the witnesses was for the jury—that the severance of the nerve was inexcusable, and that the laceration or cutting of the nerve was the cause of the loss of voice. For the injury sustained as a result of the operating surgeon's negligence, the patient is entitled to recover against the surgeon.

Doubtless, the trial court was of the view that substantial justice has not been done in the case at bar; therefore, granted a new trial. Not only is it the right of the trial court, but it is its duty, to grant a new trial when satisfied that substantial justice has not been done. We have no right to disturb the order granting the motion for a new trial.

HOLCOMB and BLAKE, JJ., concur with MILLARD, J.