[No. 36751.   Department One.   November 27, 1963.]

JOHN A. SULLIVAN, *Appellant,* v. LYON STEAMSHIP LIMITED, *Respondent.*\*

*McCutcheon, Soderland & Wells,* by *James D. McCutcheon, Jr.,* for appellant.

*Summers, Howard & Legros,* by *Thomas F. Paul,* for respondent.

HALE, J.—The sea is a strange and wondrous thing, and equally so is the law it inspires. Rules derived from it reflect not the fury of this element in its stormy mood but the gentle nature of a close harbor in the morning calm.

John A. Sullivan, merchant seaman for 22 years, was dispatched at Seattle to sign on the SS *Montego Sea,* a merchant freighter then docked at Swan Island in the Willamette River, Portland, Oregon.  His friend, Lamar Gribbon, and another seaman joined Sullivan and his wife in the drive from Seattle to Portland in Sullivan's car.  Arriving at the dock between 7 and 7:30 a.m., May 17, 1961, where the SS *Montego Sea* was moored, Gribbon took his own and Sullivan's gear aboard, using both hands to carry the sea bags and suitcases.  He says that as he walked up the gangway he noticed that the man lines on it were

\*Reported in 387 P. (2d) 76.

slack. With both hands occupied in carrying the luggage, he did not put his hands on the man lines as he moved up the gangway and stepped onto the gangway platform and the deck. He said that he saw no one on gangway watch as he went aboard.

Meanwhile, Sullivan and his wife drove their car to a service station to have a new battery installed, returning to the dock at about 7:50 a.m., about 30 minutes after Gribbon had gone aboard. Sullivan says that he walked up the gangway with both hands free, but that as he neared the top where the gangway attaches to the ship's gangway platform, he reached for and grasped the top right-hand man line with his right hand. As he expressed it, the line came slack in his hand, he lost his balance and fell overboard onto the dock, sustaining injuries from the fall. He said that he had noticed no slack in the gangway hand lines when approaching or walking up the gangway.

The gangway is a portable, demountable walkway; at the upper or ship's end, it was secured by metal pins to a small metal platform projecting out from the deck; the other end of the gangway rested on the dock.

To effect side railings on the gangway, three upright iron bars or posts, called stanchions, were inserted into sockets on each side of the gangway at nearly equidistant intervals, with one additional stanchion on the right-hand side at the ship's platform. Each stanchion had a circular eyelet at mid-point and at its upper end to allow for rigging the man lines. Seamen from the deck gang had completed rigging the gangway for intended use by passing manila lines through the mid-point eyelets to form one rope railing and another line through the top eyelets to form the upper railing. The right-hand lines were passed through the socket on the ship's platform making a 4-stanchion railing on that side. At the ship's end, the man lines were secured to the bulwark by cleats or other fixtures.

Some degree of slack in rigging these hand lines is required to accommodate the rise and fall of the ship with the tides or its movement from the surge of passing vessels. Over-taut lines will break if the ship moves appreciably.

Responsibility for maintenance of the gangway falls on the officer in charge of the deck. On this occasion, Captain Alexander Sergei Barov, former Cossack horseman and master mariner of many years' experience, had held the watch as night mate on the night preceding and on the morning that Gribbon and Sullivan came aboard. The night mate holds a temporary position during the absence of the regular mates, who are frequently ashore during hours of darkness when the ship is in port, but his authority and responsibilities are the same as those of the regular officers whom he replaces. Since the SS *Montego Sea* was a dead ship—neither loading nor discharging cargo at the time—one of the most important duties falling on the night mate was to maintain the gangway in a safe and seaman-like condition.

Captain Barov acknowledged his duty in connection with the gangway, saying:

"Well, it was the lines and the net underneath, and to make sure there was no debris on the gangway so that the men can't slip; to make sure the gangway was clear and unobstructed and the lines are taut . . ."

The first thing that he did on the morning of May 17th was, as he expressed it, referring to the gangway:

"I tightened up the lines and made sure the net [underneath] was in good shape . . ."

He said that he adjusted the hand lines by pulling them tight at the upper or ship's end and securing them to the ship by half hitches. Captain Barov said that he had inspected the gangway and the man lines six or seven times from midnight until relieved by the chief mate at about 7:55. He said he had last adjusted the man lines between 6 and 8 that morning, and on that occasion had actually walked up and down the gangway testing the hand lines for tautness as was his customary practice. He said that, although the gangway man lines ought not be completely taut, only a small amount of slack should be allowed on a dead ship at Swan Island because the tide differentials in the Willamette River, near where it joins the Columbia so far inland from the sea, are only a few inches. If the ship is

loading or discharging, the gangway lines will have to be adjusted more frequently. Captain Barov said that he was at the gangway continuously for 2 solid hours from around 6 a.m. to nearly 8 a.m., and that it was at all times safe and properly secured. He saw no one fall on or from it. The ship's deck log contained an entry showing that he had been formally relieved of duty by the chief mate at 7:20 a.m., but Captain Barov stated that, nevertheless, he remained at the gangway until about 5 minutes to 8 when the mate verbally relieved him.

Sullivan brought this action as plaintiff against the owner of the SS *Montego Sea* under the Jones Act, 46 U.S.C.A. § 688; 41 Stat. 1007, chapter 250 § 33, and also charged that the ship was unseaworthy. Both theories were submitted to the jury in instructions and in interrogatories covering the question of comparative negligence. From a verdict for the defendant on all points, the plaintiff appeals urging the insufficiency of the instructions on the question of unseaworthiness.

The trial court instructed the jury that plaintiff sought recovery upon two distinct theories, (1) that "defendant had been negligent in failing to maintain the gangway in reasonably safe condition with safely adjusted, reasonably taut lines;" and (2) "that the existence of such condition also constituted unseaworthiness." It defined negligence and contributory negligence for the jury in the classic and accepted manner, and, in instruction No. 7 gave the only instruction on seaworthiness as follows:

"Under the maritime law, a shipowner warrants to its seamen that its vessel, including gangway, is seaworthy. By this is meant that the vessel is properly equipped and maintained, and that the appliances aboard the vessel are reasonably safe for the purposes for which they are designed or intended.

"An owner is not obliged to provide the best possible vessel and gear, and his obligation as to seaworthiness is tested by whether the owner has provided a vessel and gear and crew reasonably safe and suitable for ordinary use. The standard of seaworthiness is not perfection, but reasonable fitness for the service in which the vessel is engaged."

Comparative negligence was covered by instructing the jury that, if the contributory negligence of the plaintiff concurred with that of the defendant or with unseaworthiness, it diminished his recovery in proportion to the extent plaintiff's negligence contributed to his injury. Instruction No. 15 supplied special interrogatories in five sections, covering questions of negligence, comparative negligence and unseaworthiness. Thus, the jury had before it both negligence and unseaworthiness as the law governing the case.

The four assignments of error made merge into one argument: That the definition and described legal effect of unseaworthiness were insufficient and hence did not point out the differences in law between negligence and unseaworthiness in this particular case. Defendant meets this claim of error with two arguments: (1) That the definition of and instruction on unseaworthiness appropriately distinguished it from negligence when read *in pari materia* with the other instructions, and (2) that, in this particular case, negligence and unseaworthiness are the same because the ingredients of time, duration, knowledge or notice of a claimed defect in the gangway never became an issue, either through the instructions or in the evidence.

■ We agree with respondent that negligence, described by the court as "the failure to exercise . . . that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances" in many respects differs from the standards of care imposed on the respondent by the court's instruction that a shipowner "warrants to its seamen that its vessel, including gangway, is seaworthy." We see remarkable similarities between these two concepts in this particular case, but we are doubtful that all of the instructions, when read as a single treatise, pointed out to the jury the fine, but necessarily crucial, distinctions between the claimed negligence and unseaworthiness—the elements of time and notice.

Many of the points raised by the appeal were considered and answered in *Williams v. Steamship Mut. Underwriting Ass'n,* 45 Wn. (2d) 209, 273 P. (2d) 803, when we said:

"Whether appellant's injury was due to the unseaworthiness of the vessel as defined by the long-established rules of maritime law, or to the negligence of officers or members of the crew under the new rules made available by the Jones act, or both, there was but a single wrongful invasion of a single primary right and there are not two separate claims or causes of action. *Baltimore S.S. Co. v. Phillips,* 274 U.S. 316, 71 L. Ed. 1069, 47 S. Ct. 600 (1927); *Pate v. Standard Dredging Corp.,* 193 F. (2d) 498 (1952).

"When a seaman has alleged an injury in consequence of a maritime tort in an action on either the admiralty or the law side of a United States district court or in a state court, the issue of unseaworthiness may be raised notwithstanding allegations of negligence and notwithstanding failure to allege unseaworthiness. *Sandanger v. Carlisle Packing Co.,* 112 Wash. 480, 192 Pac. 1005 (1920), affirmed, *Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 66 L. Ed. 927, 42 S. Ct. 475 (1922); *Plamals v. S.S. 'Pinar del Rio,'* 277 U.S. 151, 72 L. Ed. 827, 48 S. Ct. 457 (1928)."

To reach the problem presented by this appeal, we need not resolve the multitude of incongruities developed in the maritime law since the medieval sea codes (see Gilmore & Black, The Law of Admiralty, chapter 6). We must apply the law of today as we understand it. If it leaves the merchant mariner as the most favored and highly protected of individuals in civilized society, then, so be it. It is likely that the solicitude for the sailor shown by the modern rules arises as much from an understanding that the mariner's life is a precarious one as that it is due to any mistake made by the courts in the genesis of these rules.

We anticipated the modern rules in *Sandanger v. Carlisle Packing Co.,* 112 Wash. 480, 192 Pac. 1005, in which we held, despite the weight of authority to the contrary, that a seaman could recover for injuries sustained when he poured a fluid from a container marked "coal oil" in a galley stove to start a fire, not knowing that the can had been filled with gasoline. The explosive fire drove him

from the cabin, and, to extinguish the flames from his clothing, he leaped into the water after first searching for a life preserver. He charged both the substitution of gasoline for kerosene and the lack of a life preserver in aggravation as grounds for recovery in a jury trial.

Under the then prevailing concepts of maritime law, a seaman was limited to recovery for maintenance and cure as declared in the doctrines of *The Osceola*, 189 U.S. 158, 47 L. Ed. 760, 23 S. Ct. 483, but, in a decision presaging the future, we held that, since kerosene was customarily used for igniting a fire in the galley cookstove, the placing of gasoline in the kerosene can made the ship unseaworthy and a civil action before a jury would lie for injuries proximately resulting from the unseaworthiness. Hence, when *Sandanger v. Carlisle Packing Co., supra,* was appealed to the United States Supreme Court, *Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 66 L. Ed. 927, 42 S. Ct. 475, and there affirmed, that court took our view of things before the adoption of the Jones Act when it said:

"Considering the custom prevailing in those waters and other clearly established facts, in the present cause, we think the trial court might have told the jury that without regard to negligence the vessel was unseaworthy when she left the dock if the can marked 'coal oil' contained gasoline; also that she was unseaworthy if no life preservers were then on board; and that if thus unseaworthy and one of the crew received damage as the direct result thereof, he was entitled to recover compensatory damages. . . ."

In this fashion, *Sandanger, supra,* extended a common-law concept of negligence in Washington to maritime torts that later became the general law enforceable in all courts with the enactment of the Jones Act in 1920, 46 U.S.C.A. § 688; 41 Stat. 1007, chapter 250 § 33.

The Supreme Court of the United States said that this statute effectively obliterated all distinctions between the kinds of negligence for which a shipowner is liable and abrogated the fellow-servant doctrine theretofore thought applicable to maritime torts by many students of the subject. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 4 L. Ed. (2d) 941, 80 S. Ct. 926. The opinion draws a sharp line be-

tween negligence and unseaworthiness in speaking of the owner's duty to provide a seaworthy ship:

"... The character of the duty ... is 'absolute.' 'It is essentially a species of liability without fault, analogous to other well known instances in our law. ....'....

"... the decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care. ...."

That the United States Supreme Court determined not to waver in preserving the distinctions between unseaworthiness and negligence, so recently marked, may be seen in a case coming before it soon following *Mitchell v. Trawler Racer, Inc., supra,* when it considered *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 5 L. Ed. (2d) 20, 81 S. Ct. 6 (1960).

Michalic, a fireman aboard *The Orion,* dropped a 2½ pound wrench on his foot. Already suffering from Buerger's disease, a circulatory ailment, he asserted that the subsequent amputation of his foot and leg stemmed from the accident and alleged that the wrench he had been using was defective in having too much slack or play in its jaws. He brought suit against the shipowner under the Jones Act and on a claim of unseaworthiness. A directed verdict for the defendant by the trial court on the grounds of insufficient evidence was affirmed by the court of appeals. The supreme court reversed and remanded for a new trial, saying:

"The basic dispute between the parties is as to the sufficiency of the proofs to justify the jury's finding with reason that respondent furnished Michalic with a wrench which was not reasonably fit for its intended use. Here a distinction should be noticed between the unseaworthiness and Jones Act claims in this regard. The vessel's duty to furnish seamen with tools reasonably fit for their intended use is absolute [citing cases]; and this duty is completely independent of the owner's duty under the Jones Act to exercise reasonable care. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539. ...."

The court then adopts the language of *Cox v. Esso Shipping Co.*, 247 F. (2d) 629, and answers the very question raised by the instant case in these words:

" 'One is an absolute duty, the other is due care. Where . . . the ultimate issue . . . [is] seaworthiness of the gear. . . . The owner has an absolute duty to furnish reasonably suitable appliances. If he does not, *then no amount of due care or prudence excuses him, whether he knew, or could have known, of its deficiency at the outset or after use.* In contrast, under the negligence concept, there is only a duty to use due care, i.e., reasonable prudence, to select and keep in order reasonably suitable appliances. Defects which would not have been known to a reasonably prudent person at the outset, or arose after use and which a reasonably prudent person ought not to have discovered would impose no liability.' " *Michalic v. Cleveland Tankers, Inc., supra.* (Italics ours.)

So, we now enter an era when the maritime law sharply defines the fundamental differences between negligence and unseaworthiness. Though the standards of conduct and care—measured by that ideal man's conduct in showing ordinary prudence—may be identical with the standards by which seaworthiness is measured in a given case, this sameness is a coincidence in both the law and the facts for the tests are different. If the man lines of the gangway were defectively rigged so as to make the device unseaworthy, proof of unseaworthiness does not necessarily constitute proof of negligence, for the defect in the rigging may not have existed long enough to charge a reasonably prudent night mate or other ship's officer with knowledge of the defect. Negligence is based on fault, a failure to anticipate that which a person of reasonable prudence would foresee; on ignorance, where one is charged with knowing; on failing to anticipate what ordinary prudence foresees; on inaction, where reasonable care engenders action; on acting, when ordinarily careful persons would not act; or on acting in a manner below the standards of care required by ordinary prudence. But unseaworthiness—though it may include some or all of these concepts—is dependent on none of them. If the ship, its rigging, appliances, engines or apparel are not safe for the ordinary use to which they

will be put by the seaman who uses and mans them, they are unseaworthy. And this unseaworthiness may occur or exist when the owner's and ship's officers are free from negligence, fault or blame. See *Gentry v. States Steamship Co.,* 229 Ore. 233, 366 P. (2d) 880 (1961).

The learned trial judge came close to making this distinction when he told the jury that a shipowner warrants to seamen that the vessel, including the gangway, is seaworthy, and that such warranty means that the vessel and appliances are reasonably safe for the purposes for which they are designed or intended. But we think that the trial court should have gone one step further to explain that unseaworthiness is not dependent on fault or want of due care and may exist regardless of the care the owner of a vessel has taken to provide a safe and secure ship.

Reversed and a new trial granted.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.